AMANDA L. MORGAN (SBN 246277)
amanda.morgan@us.dlapiper.com
**DLA PIPER LLP (US)**
555 Mission St., Suite 2400
San Francisco, CA 94105
Tel.: (415) 615-6058 | Fax: (415) 659-7358

CARYN G. SCHECHTMAN (*Pro Hac Vice forthcoming*)
caryn.schechtman@us.dlapiper.com
**DLA PIPER LLP (US)**
1251 Avenue of the Americas, 27th Floor
New York, NY 10020
Tel.: (212) 335-4500 | Fax: (212) 335-4501

*Attorneys for Defendant*
*Trump Media & Technology Group Corp.*

[*Additional counsel on next page*]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

THE PEOPLE OF THE STATE OF CALIFORNIA, acting by and through San Francisco City Attorney DAVID CHIU,

Plaintiff,

vs.

TRUMP MEDIA & TECHNOLOGY GROUP CORP., DOES 1-100,

Defendants.

Case No.:

Superior Court No.: CGC-26-641192

**DECLARATION OF AMANDA L. MORGAN IN SUPPORT OF DEFENDANT TRUMP MEDIA & TECHNOLOGY GROUP CORP.'S NOTICE OF REMOVAL OF ACTION PURSUANT TO 28 U.S.C. §§ 1331, 1441, AND 1446**

[Filed concurrently with Notice of Removal; Civil L.R. 3-15 Certification; and FRCP 7.1 Corporate Disclosure Statement]

Complaint Filed: September 21, 2026

ERIC FORNI (*Pro Hac Vice forthcoming*)
eric.forni@us.dlapiper.com
**DLA PIPER LLP (US)**
33 Arch Street, 26th Floor
Boston, MA 02110
Tel.: (617) 406-6000

RACHEL A.H. HORTON (*Pro Hac Vice forthcoming*)
rachel.horton@us.dlapiper.com
MICHAEL GNIWISCH (SBN 348762)
michael.gniwisch@us.dlapiper.com
**DLA PIPER LLP (US)**
1650 Market St., Suite 500
Philadelphia, PA 19103
Tel.: (215) 656-3300

NOORVIK MINASIAN (SBN 332883)
noorvik.minasian@us.dlapiper.com
**DLA PIPER LLP (US)**
2000 Avenue of the Stars, Suite 400
Los Angeles, CA 90067
Tel.: (310) 595-3000

SETH BILLINGSLEY (*Pro Hac Vice forthcoming*)
seth.billingsley@us.dlapiper.com
**DLA PIPER LLP (US)**
1900 N. Pearl Street, Suite 2200
Dallas, TX 75201
Tel.: (214) 743-4536

JOSH HALPERN (*Pro Hac Vice forthcoming*)
jhalpern@jhlegalpllc.com
**JH Legal PLLC**
1100 H Street NW, Suite 840
Washington, DC 20005
Tel.: (610) 405-5531

*Attorneys for Defendant*
*Trump Media & Technology Group Corp.*

I, Amanda L. Morgan, declare as follows:

1. I am an attorney duly licensed to practice law in the State of California and admitted to practice before this Court. I am a partner at the law firm DLA Piper LLP (US), counsel of record for Defendant Trump Media & Technology Group Corp. ("TMTG") in the above-captioned action.

2. I submit this Declaration in support of TMTG's Notice of Removal of Action pursuant to 28 U.S.C. §§ 1331, 1441(a), and 1446, filed concurrently herewith.

3. I am over the age of 18 years. I have personal knowledge of the facts set forth in this Declaration, including through my review of the files maintained by my firm in this matter and the docket of the Superior Court of California, County of San Francisco, and, if called as a witness, I could and would competently testify thereto.

4. On September 21, 2026, Plaintiff the People of the State of California, acting by and through San Francisco City Attorney David Chiu, filed a Complaint for Injunctive Relief and Civil Penalties for Violations of the Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 *et seq.*) against TMTG and Does 1-100 in the Superior Court of California, County of San Francisco (the "Superior Court"), captioned *The People of the State of California, acting by and through San Francisco City Attorney David Chiu v. Trump Media & Technology Group Corp., et al.*, Case No. CGC-26-641192 (the "State Court Action").

5. Attached hereto as **Exhibit A** is a true and correct copy of the Complaint filed in the State Court Action.

6. On September 21, 2026, Plaintiff filed a Civil Case Cover Sheet in which it designated the action as complex and requested assignment to complex litigation, and the Superior Court issued a Notice to Plaintiff. Thereafter, on October 8, 2026, Plaintiff filed a Notice of Application and Application for Complex Designation, which the Superior Court granted on October 26, 2026. The action has been assigned to the Complex Litigation Department 613, and an initial case management conference is scheduled for December 14, 2026.

7. Attached hereto as **Exhibit B** are true and correct copies of all process, pleadings, and orders filed in the State Court Action, as reflected on the Superior Court's docket, including the Civil Case Cover Sheet and the Notice to Plaintiff.

8. Attached hereto as **Exhibit C** is a true and correct copy of the docket report for the State Court Action, as retrieved on November 18, 2026.

9. Plaintiff served TMTG with the Summons and Complaint in the State Court Action on October 20, 2026.

10. Other than TMTG, the only defendants named in the Complaint are fictitiously named "Does 1-100." To my knowledge, no Doe defendant has been identified or served in the State Court Action.

11. No further process, pleadings, or orders related to this case have been filed in the San Francisco County Superior Court or served by any party other than as described above, and no proceedings related hereto have been heard in the San Francisco County Superior Court.

12. No previous application has been made for the relief requested in the Notice of Removal.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 18, 2026, at San Francisco, California.

*_/s/ Amanda L. Morgan_*
AMANDA L. MORGAN

# EXHIBIT A

DAVID CHIU, SBN 189542
City Attorney
YVONNE R. MERÉ, SBN 173594
Chief Deputy City Attorney
SARA J. EISENBERG, SBN 269303
Chief of Complex and Affirmative Litigation
ALEXANDER J. HOLTZMAN, SBN 311813
MOLLY J. ALARCON, SBN 315244
Deputy City Attorneys
Fox Plaza
1390 Market Street, 7th Floor
San Francisco, CA 94102-5408
Telephone: (415) 554-3800
Facsimile: (415) 554-3837
E-Mail: Alexander.Holtzman@sfcityatty.org
Molly.Alarcon@sfcityatty.org

Attorneys for Plaintiff
THE PEOPLE OF THE STATE OF CALIFORNIA, acting by and through San Francisco City Attorney DAVID CHIU

ELECTRONICALLY
**F I L E D**
*Superior Court of California, County of San Francisco*
**09/21/2026**
**Clerk of the Court**
**BY: BENJAMIN YUST**
**Deputy Clerk**

**EXEMPT FROM FILING FEES PURSUANT TO GOVERNMENT CODE SECTION 6103**

*[Additional counsel on next page]*

**CGC-26-641192**

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO

UNLIMITED JURISDICTION

THE PEOPLE OF THE STATE OF CALIFORNIA, acting by and through San Francisco City Attorney DAVID CHIU,

Plaintiff,

vs.

TRUMP MEDIA & TECHNOLOGY GROUP CORP., DOES 1-100,

Defendants.

Case No.

**COMPLAINT FOR INJUNCTIVE RELIEF AND CIVIL PENALTIES FOR VIOLATIONS OF THE UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE §§ 17200, *et seq.*)**

MATTHEW J. PLATKIN*
ANGELA CAI*
AARON E. HAIER*
Platkin LLP
1 Gateway Center #1150
Newark, NJ 07102
Telephone: (973) 561-1950
E-Mail: mplatkin@platkinllp.com
acai@platkinllp.com
ahaier@platkinllp.com

KYLE R. FREENY, SBN 247857
NATHANIEL A.G. ZELINSKY*
Washington Litigation Group
1717 K Street NW
Washington, DC 20006
Telephone: (202) 521-8750
E-Mail: kfreeny@washingtonlitigationgroup.org
nzelinsky@washingtonlitigationgroup.org

NORMAN L. EISEN*
DAVID W. OGDEN*
CHRISTOPHER J. SWARTZ*
Democracy Defenders Fund
600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003
Telephone: (202) 594-9958
E-Mail: norman@democracydefenders.org
david@democracydefenders.org
chris@democracydefenders.org

* *Pro Hac Vice applications forthcoming*

Plaintiff the People of the State of California, acting by and through San Francisco City Attorney David Chiu (the "People"), bring this action against Defendant Trump Media & Technology Group Corp. ("Trump Media") for creating a corrupt business scheme.

1. Trump Media, which owns and operates the social media platform Truth Social, has created a service called "Truth API" that charges select customers $100,000 per month for priority access to President Donald J. Trump's ("Trump") and other high-level officials' posts on Truth Social—including announcements of consequential government decisions that can move financial markets—before those posts are available to any other users. This creates financial gain for Trump Media, as well as for Trump, who owns 41 percent of Trump Media through a revocable trust in which he is the sole beneficiary.

2. Trump Media's creation and operation of a commercial mechanism that monetizes preferential access to information derived from Trump's government service while that information remains unavailable to the general public violates the public trust and California's Unfair Competition Law ("UCL"), which prohibits unlawful and unfair business practices. Trump Media's creation and operation of Truth API is both.

3. Trump Media's scheme is *unlawful* under the UCL for two reasons.

4. First, Trump Media is aiding and abetting Trump's violation of federal ethics and anti-corruption law. Federal law expressly prohibits federal officials, including the President, from using nonpublic information obtained through their government service as a means of making a private profit. This law embodies a basic principle of American government: the powers of public office, including access to sensitive nonpublic information, that are entrusted to federal officials for the service of the Nation may not be exploited as instruments of private enrichment. Trump Media's conduct corrupts this principle. Trump Media has unlawfully created, priced, marketed, and operated a commercial mechanism that knowingly and willfully facilitates Trump's use of nonpublic information for private profit.

5. Second, Trump Media violates other federal laws that protect against insider trading. These laws prohibit taking material nonpublic information from a person with a duty of trust and confidence and selling it to individuals who might reasonably trade on it to obtain an unfair financial

advantage. Trump Media does precisely this, orchestrating the sale of material nonpublic information to Truth API subscribers with the knowledge and intent that those subscribers will use it to gain a market advantage.

6. In addition to being unlawful, Trump Media's business practices are also *unfair* in violation of the UCL because the harm they impose greatly outweighs the utility of their conduct. Defendant's scheme facilitates the appropriation of information held in the public trust for private gain. That practice disadvantages law-abiding businesses and ordinary Californians, who participate in financial markets in various ways, including through their retirement accounts, 401(k)s, pensions and other public sector funds, 529 Plans for their children's educations, and individual investment accounts. These everyday investors are placed at a substantial disadvantage to sophisticated firms willing and able to pay extraordinary sums for advanced access to market-moving information. Trump Media's scheme is unprecedented in its monetization of nonpublic information obtained through government service and sold on the private market.

7. The People seek to halt Trump Media's unlawful and unfair business practices and prevent Trump Media from commoditizing the public trust vested in executive branch officials into private gain, to the disadvantage of everyday Californians.

**PARTIES**

8. The People bring this civil enforcement action by and through San Francisco City Attorney David Chiu pursuant to authority granted under the UCL, specifically California Business & Professions Code Sections 17204 and 17206(a).

9. Trump Media is a Florida corporation headquartered in Sarasota, Florida.

10. Upon information and belief, Defendants Does 1-100 are other individuals or entities that were or are involved in the design, conception, marketing, pricing, or operation of Truth API. The identities of Does 1-100 are unknown to the People at this time. The People will move the Court to name Does 1-100 as their identities become known to the People through discovery.

11. Each Defendant, directly or through parents, subsidiaries, affiliates, agents, and contractors, participated in or controlled the creation, marketing, pricing, and operation of Truth API. Defendants acted as agents of one another within the scope of their agencies; certain Defendants are

successors/alter egos of others; and each is jointly and severally liable for the acts and omissions alleged herein. Each and every managing agent, agent, representative, and/or employee of each of the Defendants was working within the course and scope of that agency, representation, and/or employment with the knowledge, consent, ratification, and authorization of each of the Defendants and their directors, officers, and/or managing agents.

## JURISDICTION AND VENUE

12. The Superior Court has original jurisdiction over this action pursuant to Article VI, Section 10 of the California Constitution, which grants the Superior Court original jurisdiction in all causes other than those specifically enumerated therein.

13. The Superior Court has personal jurisdiction over Trump Media pursuant to California Code of Civil Procedure Section 410.10. Trump Media conducts business transactions in California; has intentionally availed itself of the laws and markets of California through the use, promotion, sale, marketing, or distribution of their products and services at issue in this Complaint, including marketing to cryptocurrency firms and artificial intelligence firms, many of which are based in California or have a significant presence in California; has committed unlawful acts arising from and related to its conduct and activity in California complained of in this Complaint; and has committed unlawful acts expressly aimed at California residents from which this action arises.

14. Venue is proper in this Court because the unlawful conduct occurred in San Francisco and elsewhere in California. Venue is also proper pursuant to Code of Civil Procedure Section 393 because at least some part of the causes of action alleged herein arose in the City and County of San Francisco. Trump Media's unlawful and unfair business practices are directed to and affect financial markets and market participants in San Francisco, including investment firms and ordinary investors who transact in those markets and are disadvantaged by Trump Media's sale of preferential access to market-moving government information.

## STATEMENT OF FACTS

### Trump Launches Truth Social

15. Trump launched his own social media platform—Truth Social—in February of 2022 after being kicked off mainstream social media sites for supporting a violent insurrection at the United States Capitol.

16. Trump Media, a company originally incorporated in February 2021 and merged in 2024 with Digital World Acquisition Corp., operates Truth Social.[1]

17. Trump holds the largest percentage of Trump Media's shares. Following the November 2024 election, Trump transferred his shares to the Donald J. Trump Revocable Trust (the "Trust"). Trump's son, Donald Trump Jr., is the sole trustee. At present, Trump is the Trust's sole beneficiary,[2] and therefore any financial gain from the Trust's stake in Trump Media will ultimately inure to Trump's benefit. As of July 2026, it is estimated that the Trust holds about 41% of all the outstanding stock in Trump Media.[3]

18. Trump is not a mere passive investor in Trump Media. Interim CEO Kevin McGurn has referred to Trump as "the one at the end of the phone."[4]

19. Since its inception, Truth Social's business model has been highly dependent on monetizing Trump's extensive use of the site.

---

[1] Trump Media & Tech. Grp. Corp., Annual Report (Form 10-K), (filed Feb. 14, 2025), https://www.sec.gov/ix?doc=/Archives/edgar/data/1849635/000114036125004822/ef20039039_10k.htm; Trump Media & Tech. Grp. Corp., Annual Report (Form 10-K), (filed Feb. 27, 2026), https://www.sec.gov/ix?doc=/Archives/edgar/data/1849635/000114036126007174/ef20062365_10k.htm.

[2] Matthew Goldstein, *Trump Puts $4 Billion in Shares of His Media Company in a Trust*, N.Y. Times (Dec. 20, 2024), https://perma.cc/S49P-NGEC.

[3] Deborah Mary Sophia & Saqib Iqbal Ahmed, *Truth Social to Sell Trading Firms 'Fastest' Access to Trump's Posts*, Reuters (July 16, 2026), https://perma.cc/DM7W-BQZC.

[4] Daniel Thomas, *The Executive Trying to Monetise Trump's Posts, Financial Times* (Aug. 6, 2026), https://perma.cc/UC49-6Q6D.

20. Before Truth Social even launched, Trump Media secured an agreement that granted the company a six-hour exclusivity window to anything Trump posts, requiring him to wait six hours after posting on Truth Social before posting the same message on any other social media platform.[5]

**Trump Posts Market-Moving Information on Truth Social**

21. Trump's posts on Truth Social have consequences. In fact, there are numerous examples where Trump's announcement of a policy decision or official government information on Truth Social—information that, until the post, was nonpublic—influenced financial, securities, and other trading markets. A few are listed below.

a. On the morning of April 9, 2025, Trump posted on Truth Social: "THIS IS A GREAT TIME TO BUY!!! DJT."[6] Hours later, he announced that he was pausing country-by-country tariffs by 90 days, with the exception of China. That led to large moves in the stock market, including the NASDAQ Index's largest one-day gain since 2008 and a 9.5% increase in the S&P 500.[7]

b. On May 23, 2025, Trump announced that he was no longer opposed to Japan Nippon Steel's $14 billion investment in U.S. Steel in Pittsburgh:

[5] Digital World Acquisition Corp., Registration Statement (Form S-4), at 210 (May 16, 2022), https://perma.cc/PQN9-QQ3U; Reuters, *Trump's Truth Social Posts Will Have to Wait Before Reposts on Other Platforms* (May 16, 2022), https://perma.cc/KB73-2ZFN; *see also* Trump Media & Tech. Grp. Corp., Annual Report (Form 10-K/A), at 25 (filed Apr. 30, 2026), https://www.sec.gov/ix?doc=/Archives/edgar/data/1849635/000114036126018230/ef20071731_10ka.htm.

[6] Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 9, 2025), https://perma.cc/YL56-VTXK.

[7] Rob Wile, *Experts, Critics Raise Questions After Trump Says "This Is a Great Time to Buy" Before Pausing Tariffs*, NBC News (Apr. 9, 2025), https://perma.cc/CYV6-NL7D.


Donald J. Trump
@realDonaldTrump

I am proud to announce that, after much consideration and negotiation, US Steel will REMAIN in America, and keep its Headquarters in the Great City of Pittsburgh. For many years, the name, "United States Steel" was synonymous with Greatness, and now, it will be again. This will be a planned partnership between United States Steel and Nippon Steel, which will create at least 70,000 jobs, and add $14 Billion Dollars to the U.S. Economy. The bulk of that Investment will occur in the next 14 months. This is the largest Investment in the History of the Commonwealth of Pennsylvania. My Tariff Policies will ensure that Steel will once again be, forever, MADE IN AMERICA. From Pennsylvania to Arkansas, and from Minnesota to Indiana, AMERICAN MADE is BACK. I will see you all at US Steel, in Pittsburgh, on Friday, May 30th, for a BIG Rally. CONGRATULATIONS TO ALL!

7.51k ReTruths 30.9k Likes May 23, 2025, 3:25 PM
[8]

Immediately after that post, U.S. Steel's share price rose roughly 22.5%, from $42.90 to $52.55.



[9]

[8] Donald J. Trump (@realDonaldTrump), Truth Social (May 23, 2025), https://perma.cc/7GCC-XFRM.

[9] Shradha Dinesh & James Benedict, *See How Trump's Truth Social Posts Move Stocks*, Wall St. J. (July 18, 2026), https://perma.cc/92UY-ZTDP.

c. In the evening of January 8, 2026, Trump posted results from the Bureau of Labor Statistics ("BLS") monthly employment report on Truth Social 12 hours before their official release to the public.[10]




As the Financial Times explains, BLS's monthly jobs report "is among the most closely watched US economic gauges, providing critical information to traders, particularly in the $30tn Treasury market."

d. In March 2026, a Truth Social post by Trump announcing "very good and productive conversations" with Iran[11] caused oil prices to tumble and the Dow Jones Industrial Average to rise by over 1,000 points.[12]

---

[10] Ian Hodgson, Amelia Pollard & Jill R. Shah, *Donald Trump Posted Jobs Data Early on Truth Social*, Fin. Times (Jan. 9, 2026), https://perma.cc/C7CG-M2SM.

[11] Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 23, 2026), https://perma.cc/26FW-FDRV.

[12] Aimee Picchi & Mary Cunningham, *Oil Trades Surged Just Before Trump's Post on Iran Talks. Some Experts Are Suspicious*, CBS News (Mar. 25, 2026), https://perma.cc/T5TM-EWEV. In fact, 15 minutes before the Truth Social post, $580 million worth of oil futures contracts were sold, raising significant concerns about insider trading *prior* to any announcement. Eva Roytburg, *Nobel Laureate*

e. On June 11, 2026, Trump posted on Truth Social that the U.S. would hit Iran "VERY HARD, TONIGHT" and seize Kharg, an island in the Gulf that handles about 90% of Iran's oil exports and hosts large storage facilities.[13] Immediately after the post, crude-oil futures—which had been declining—surged.[14]

**Trump Media Launches Truth API to Provide Early Access to Market-Moving Posts—for a Price**

22. Recognizing the value such market-moving posts have to investors, Trump Media decided to capitalize on them. On July 17, 2026, Trump Media announced that it was launching a new, paid data service, "Truth API," that would deliver posts from Truth Social's ten most influential accounts—including Trump's account—to paying subscribers faster than the same information is delivered to the platform's other users.[15]

23. Trump Media has not publicly disclosed the complete list of the ten accounts covered by Truth API, but media reporting indicates that, as of early August 2026, in addition to Trump, the list included several other executive branch officials whose roles provide them with access to important nonpublic information obtained through their government service: Vice President J.D. Vance, White House Deputy Chief of Staff Dan Scavino, outgoing White House Press Secretary Karoline Leavitt, and Transportation Secretary Sean Duffy. Other top Truth Social accounts include Donald Trump Jr., the White House official account, former Fox News host Maria Bartiromo, former Trump Media CEO and Congressman Devin Nunes, and former FBI Deputy Director Dan Bongino.

24. Truth API purportedly went live on August 1, 2026.[16]

---

*Paul Krugman Calls It 'Treason': $580 Million in Suspicious Oil Futures Traded Minutes Before Trump's Iran Reversal*, Fortune (Mar. 24, 2026), https://perma.cc/C9QJ-C7U5.

[13] Donald J. Trump, (@realDonaldTrump), Truth Social (June 11, 2026), https://perma.cc/FTZ8-8NEA.

[14] Tomi Kilgore, *Oil Prices Spike After Trump's Threat to Hit Iran 'VERY HARD'*, MarketWatch (June 11, 2026), https://perma.cc/4GFP-HLVZ.

[15] Costas Mourselas et al., *Trump Media Fast Feed for President's Posts Sparks Wall Street Backlash*, Fin. Times (July 23, 2026), https://perma.cc/U6S5-5LRQ.

[16] Dan Levin, *Trump's Truth Social Posts Move Markets. Is Selling Early Access to Them Legal?*, Straight Arrow News (July 17, 2026), https://perma.cc/Q2QY-LEEH.

25. Since then, Trump has continued posting on Truth Social with knowledge that Trump Media is using that nonpublic information for his and the company's private gain through Truth API. Indeed, the same day Truth API launched, Trump posted on Truth Social that he was calling off a planned strike on Iran:



Donald J. Trump
@realDonaldTrump

The U.S.A. is locked and loaded and ready to go against the Islamic Republic of Iran, at levels of Military Terror, Strength, and Power not seen since World War II. Despite this, we have just been asked by Iran, and other Middle Eastern Countries, to hold off any attack in that the perimeters of a deal has been agreed to. This would include the Immediate, Complete, and Total OPENING OF THE HORMUZ STRAIT, and an end to Iran's nuclear threat. Based on this request, I have agreed, for the future benefit of the WORLD and, likewise, the survival of a successful and prosperous Iran, to cancel the attack, subject to being able to rapidly make a DEAL. The Country of Israel joins me in this commitment. Get to work, everybody, and get it DONE. Thank you for your attention to this matter! President DONALD J. TRUMP

**6.66k** ReTruths **25.2k** Likes Aug 01, 2026, 10:05 PM

[17]

That post immediately led to a 5% decline in oil prices, as measured by the West Texas Intermediate futures U.S. benchmark and the Brent crude oil international futures benchmark.[18]

26. On August 21, 2026, Trump announced on Truth Social that the federal government was taking action "to lower the price of ground beef for working American families." Specifically, Trump explained that "for the next 90 days, the United States will allow up to 300,000 metric tons of product for ground beef to be imported with no out of quota tariff."

---

[17] Donald J. Trump (@realDonaldTrump), Truth Social (Aug. 1, 2026), https://perma.cc/5Y2G-LSRV.

[18] Spencer Kimbal & Lee Ying Shan, *Oil Prices Tumble After Trump Calls off Attack on Iran*, CNBC (Aug. 3, 2026), https://perma.cc/V7Q2-YEBJ.



Donald J. Trump
@realDonaldTrump

Today, I concluded a deal to substantially lower the price of ground beef for working American families. As everyone knows, under President Biden, beef prices soared at their fastest rate and the American beef herd fell to its smallest size in modern history. As we work to rebuild this herd and help our ranchers, for the next 90 days, the United States will allow up to 300,000 metric tons of product for ground beef to be imported with no out of quota tariff. We have a commitment that this beef will be sold at 25 percent below current market prices. This deal will reduce prices for Americans while giving space for our Great American Beef Herd to grow again. Thank you for your attention to this matter! President DONALD J. TRUMP

**6.46k** ReTruths **27.1k** Likes Aug 21, 2026, 6:52 AM

[19]

This announcement caused a notable market decline, with cattle futures already down when the market opened just a few hours later.[20]

27. By that time, according to Trump Media, more than ten customers had already signed up for Truth API, primarily high-frequency trading firms. Trump Media's interim CEO stated the company was also in talks to expand the service to hyperscalers (operators of giant networks of data centers), large news organizations, and large-language-model developers.[21] He stated that the company wanted to expand beyond its current subscriber set of high-frequency trading firms to other customers, such as cryptocurrency firms and artificial intelligence companies.[22]

28. Access to Truth API is reportedly priced at $100,000 per month. Reports indicate that Trump Media also pitched some firms a discounted rate of $60,000 per month in exchange for a three-

---

[19] Donald J. Trump (@realDonaldTrump), Truth Social (Aug. 21, 2026), https://perma.cc/CXG7-MP7Y.

[20] *See* Angie Stump Denton, *Trump Announces Deal to Slash Ground Beef Prices by 25%, Sends Markets Lower*, Drovers (Aug. 21, 2026), https://perma.cc/9PKJ-NKUS.

[21] Sasha Rogelberg, *Nearly a Dozen Firms Are Already Paying up to $100,000 per Month for Early Access to Trump's Truth Social Posts*, Fortune (Aug. 12, 2026), https://perma.cc/VHJ6-27G5.

[22] Kevin Breuninger, *Trump Media CEO Defends Selling Faster Access to President's Truth Social Posts, Says More Have Signed up*, CNBC (Aug. 24, 2026), https://perma.cc/RU95-WCVM.

year commitment.[23]

29. The extraordinary fees reportedly charged for Truth API reflect the significant economic value of obtaining access to nonpublic information from Trump and his associates before other market participants, including the general public, can receive and act upon the same information.

30. According to public reporting, Trump Media's pitch sheet to investors expressly touts ten "market-moving posts" from Trump on Truth Social, including Trump's June 2026 post referenced above saying that the U.S. would hit Iran "very hard tonight." Trump Media's marketing for Truth API proclaims: "When @realDonaldTrump Truths, the world reacts. No comparable signal exists. No official API has ever been offered. Until now."[24]

31. Trump Media Interim CEO Kevin McGurn expressly stated that Truth API pushes out information at a "50 millisecond advantage" that "goes right into an algorithmic trading platform and they start to look at context and figure out what those trades can be."[25]

32. When subscribers obtain early access to market-moving information before anyone else, those subscribers can gain an advantage in financial and other markets by trading on that information. For example, a subscriber that receives information about imminent U.S. action in the Middle East that will likely raise the price of oil knows to purchase or sell affected securities or commodities futures milliseconds before other market participants do and at prices that do not yet reflect that not-yet public information. They can turn a profit based on their early access where the average market participant cannot. As Nejat Seyhun, a professor of finance at the University of

---

[23] Harry Thompson, *Trump's Truth Social Cash Grab Ignites Wall Street Fury*, Daily Beast (July 23, 2026), https://perma.cc/AFM2-7E64; *Trump Media Pitched $100,000 Monthly Fee for Fastest Feed of U.S. President's Posts, Sources Say*, CNBC (July 18, 2026), https://perma.cc/B49F-QTLW.

[24] Samuel Agini et al., *Trump Media Pitched $100,000 Monthly Fee for Fast Feed of President's Posts*, Fin. Times (July 17, 2026), https://perma.cc/7KKV-3Y5D.

[25] Kevin Breuninger, *Trump Media Interim CEO Kevin McGurn on Truth API: This Was Demand That Came to Us from the Market, CNBC* (Aug. 24, 2026), https://www.cnbc.com/2026/08/24/trump-media-ceo-truth-api.html.

Michigan, explained, "You can trade in milliseconds . . . . So, if you have a millisecond advantage over everybody else, you can act on it first."[26]

33. This market advantage comes at the expense of other investors and investment firms, including those in San Francisco and throughout California, unwilling or unable to pay for Truth API.

34. Thus, Truth API disadvantages regular investors, including individuals who hold investments via pension funds, 401(k) plans, and other retirement funds, whose investment vehicles do not and/or cannot obtain Truth API's early-access information. That includes, for example, public employees whose retirement benefits are invested in public-sector pension funds. It also includes private sector union workers in industries like healthcare, construction, hospitality, retail, trucking, freight, warehouse and distribution, and dockworkers and longshore workers whose retirement benefits are invested in jointly-trusted multiemployer funds. It also includes individual investors who invest in mutual funds and exchange-traded funds.

35. The existence of Truth API creates an uneven playing field amongst financial and investment firms. As the Financial Times reported, hedge fund executives, unsettled by the structure, price, and potential legal risks of the service, may be pressured to participate anyway. One macro hedge fund executive said, "[Trump's] tweets move markets so we all need to pay up." A second called the arrangement "scandalous," but said competitive pressure would likely force firms to subscribe anyway.[27]

36. One brokerage firm principal estimated that upwards of 100 high frequency firms could sign up. "For the big guys, it's going to be something they need . . . . It's market-moving information."[28] If this estimate is accurate, Trump Media—which was previously struggling to develop a financially sustainable social media business through ordinary competition and reported

---

[26] Daniel de Visé, *Truth Social Is Selling Faster Access to Trump Posts. Is That Legal?*, USA Today (Aug. 21, 2026), https://perma.cc/U9CV-DK6E.

[27] Harry Thompson, *Trump's Truth Social Cash Grab Ignites Wall Street Fury*, Daily Beast (July 23, 2026), https://perma.cc/AFM2-7E64.

[28] Bernard Condon & Brian Slodysko, *Trump Stands to Profit off US Policy Announcements by Selling Fast Access to His Social Media Posts*, Associated Press (Aug. 1, 2026), https://perma.cc/8FNX-FJFH.

losses totaling hundreds of millions of dollars in recent years[29]—could see a Truth API windfall of $10 million per month, or approximately $300 million before the end of Trump's presidential term.

37. Trump Media is not trying to hide that it is monetizing access to nonpublic information as a means of making private profit for itself, and therefore also for Trump. In a press release, interim CEO of Trump Media, Kevin McGurn, said: "Markets already move on Truth Social posts . . . . Truth API delivers a direct, licensed, real-time feed of the platform's most market-moving [posts] while advancing our strategy to monetize proprietary assets through a high-margin, recurring revenue stream."[30] This is unprecedented, unethical and—as discussed below—unlawful.

**Trump Media's Conduct Is Unlawful and Unfair**

38. Truth API drew immediate, and bipartisan, criticism from lawmakers. Senator Bill Cassidy (R-La.) stated, "I think that's wrong. It's a form of buying access." Senator Susan Collins (R-Me.) reacted, "That does not sound appropriate." Senator Lisa Murkowski (R-Alaska) commented, "The president is the president of the United States and not in a position to use the position to enhance your own personal wealth. I hope he's not thinking about that." Senator John Curtis (R-Utah) said, "all I can tell you it's not something I would do." Senator Thom Tillis (R-N.C.) commented that "just the appearances" of the plan are problematic, "before you even get into any of the ethical or legal aspects of it."[31] Representatives Ritchie Torres (D-N.Y.) and Angie Craig (D-Minn.) separately asked the SEC and the U.S. Department of Justice to investigate the service. U.S. Senators Elizabeth Warren (D-Mass.) and Adam Schiff (D. Calif.) separately asked the SEC to determine whether the service violates

---

[29] Todd Spangler, *Truth Social Parent Trump Media Posts Q1 Net Loss of $31.7 Million on Net Sales of $821,000, Ends Quarter with $759 Million in Cash and Investments*, Variety (May 9, 2025), https://perma.cc/2FJY-KJZE; Zach Everson & Dan Alexander, *Trump Media Lost $54.8 Million Last Quarter as Bitcoin Bet Backfires*, Forbes (Nov. 7, 2025), https://perma.cc/Q4ZQ-DDBY; Isaac Schorr, *Trump Media Says Goodbye to CEO Devin Nunes After Taking $712M Net Loss*, Mediaite (Apr. 22, 2026), https://perma.cc/RU3S-G3MK; Kevin Breuninger, *Trump Media Posts $238 Million Second-Quarter Loss as Crypto Declines*, CNBC (Aug. 10, 2026), https://perma.cc/XSF4-74DC.

[30] Press Release, Trump Media & Tech. Grp. Corp., *Trump Media and Technology Group Launches Truth API, a New Licensed Data Service for Financial Services Partners that Provides the Fastest Access to Truth Social's Most Influential Accounts* (July 16, 2026), https://perma.cc/647X-54AU (emphasis added).

[31] Alexander Bolton, *GOP Senators Criticize Trump Plan to Sell Access to Truth Social Posts*, The Hill (July 23, 2026), https://perma.cc/99RJ-8KL3.

insider-trading and market-manipulation laws.[32] The SEC has not announced any plans to investigate Truth API—an unsurprising failure given Trump's control over the agency. *See Ensuring Accountability for All Agencies*, Exec. Ord. 14215, 90 Fed. Reg. 10447 (Feb. 18, 2025) ("[I]t shall be the policy of the executive branch to ensure Presidential supervision and control of the entire executive branch" including independent regulatory agencies such as the SEC.).

39. Lawmakers' concerns are well founded. As discussed further below, Trump Media's scheme is unlawful under the UCL because it aids and abets a violation of federal ethics and anti-corruption law and independently violates federal securities law.

40. As to the former, federal ethics and anti-corruption law prohibits public officials from converting their informational advantages from public office into a means of private profit. In 2012, Congress passed the STOCK Act, Pub. L. No. 112-105, 126 Stat. 291 (2012). The STOCK Act is best known for confirming that federal insider trading laws apply to Members of Congress and executive branch officials, including the President, and for imposing related disclosure and ethics requirements. It also includes Section 9(a), which separately prohibits executive branch officials, including the President, from using "nonpublic information derived from such person's position as an executive branch employee or gained from the performance of such person's official responsibilities as a means for making a private profit." Pub. L. No. 112-105, §§ 9(a), 2(3). This provision is much broader than a prohibition on insider trading; rather, it is a prohibition on government officials profiting in any way from the use of such nonpublic information. Trump Media facilitates precisely this forbidden conduct by creating a literal platform for Trump to use nonpublic information derived from his position and performance of his official responsibilities as a means for making a private profit for him and the company, to the detriment of ordinary investors and the broader American public.

41. As to the latter, federal law, including Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, prohibit trading on, or facilitating others' trading on, material nonpublic information before that information is available to

---

[32] *See* Letter from Sens. Elizabeth Warren and Adam Schiff to Hon. Paul S. Atkins, Chairman, SEC (July 28, 2026), https://perma.cc/73LF-7XZV; Letter from Rep. Richie Torres to Hon. Paul S. Atkins, Chairman, SEC (July 21, 2026), https://perma.cc/G75H-N2V2.

the investing public. And 18 U.S.C. § 2 and § 371 criminalize attempt and conspiracy, respectively. These laws prohibit trading on misappropriated material nonpublic information, commonly known as "insider trading," or conspiring or attempting to do the same, including by knowingly or intentionally providing material nonpublic information to others so they may trade on it. Section 9(b) of the STOCK Act (codified at 15 U.S.C. § 78u-1(h)(1)) makes clear that federal securities laws apply to executive branch employees, who owe a "duty arising from a relationship of trust and confidence to the United States Government and the citizens of the United States with respect to material, nonpublic information derived from such person's position . . . or gained from the performance of such person's official responsibilities." Trump Media violates these laws by intentionally creating and monetizing opportunities for paid subscribers to trade on material nonpublic information before that information is available to the general public, including everyday investors.

42. Trump Media's conduct is also unfair under the UCL. It has no legitimate social utility—it benefits only Trump Media, Trump, and the few wealthy entities that can afford to pay them. It harms regular investors including individuals who hold investments via pension funds, 401(k) plans, and other retirement funds. And it violates the fundamental anti-corruption principle that nonpublic government information is not an asset to be exploited for private financial gain. This principle is of no recent vintage: fifty-four years before the passage of the STOCK Act, Congress passed a Code of Ethics for Government Service that "should be adhered to by all Government employees, including officeholders" including that "[a]ny person in Government service should . . . Never use any information coming to him confidentially in the performance of governmental duties as a means for making private profit." Code of Ethics for Government Service, 72 Stat. B12, H. Con. Res. 175, 85th Cong. (1958).

43. Trump Media's corrupt business practice is unprecedented, unscrupulous, and offends longstanding public policy; as such, it is both unfair and unlawful in violation of the UCL.

**CAUSE OF ACTION – UNFAIR COMPETITION LAW**

***California Business and Professions Code §§ 17200 et seq.***

44. The People re-allege and incorporate by reference each and every paragraph above as though fully set forth herein.

45. Trump Media has engaged in, and continues to engage in, acts or practices that are unlawful and unfair in violation of Section 17200 *et seq*. of the Business and Professions Code.

46. The UCL prohibits "unfair competition," which it defines to "mean and include any unlawful, unfair or fraudulent business act." Bus. & Prof. Code § 17200.

47. This provision "establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent." *Capito v. San Jose Healthcare Sys., LP*, 17 Cal. 5th 273, 284 (2024).

48. The "unlawful" acts prohibited by the UCL are "any practices forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made." *Saunders v. Super. Ct.*, 27 Cal. App. 4th 832, 838-39 (1994). A private right of action under a predicate statute is not necessary to state a UCL violation based on that statute. *Blakemore v. Super. Ct.*, 129 Cal. App. 4th 36, 52 n.17 (2005). An action that is not otherwise unlawful may nevertheless violate the UCL if it is "unfair." *Capito*, 17 Cal. 5th at 284 ("[A] practice is prohibited as 'unfair' or 'deceptive' even if not 'unlawful' and vice versa.").

49. Trump Media is a "person" subject to the UCL, pursuant to Business and Professions Code § 17201. The UCL imposes liability where a defendant's own business practice aids and abets another's unlawful conduct, including when the defendant provides "substantial assistance or encouragement" to the underlying violation. *Schulz v. Neovi Data Corp.*, 152 Cal. App. 4th 86, 94 (2007).

50. Trump Media engaged in, and continues to engage in, unlawful business practices in violation of the UCL by (a) aiding, abetting, facilitating, and substantially assisting and encouraging violations of federal ethics and anti-corruption law—namely, Section 9(a) of the STOCK Act, Pub. L. No. 112-105, 126 Stat. 291 (2012); and (b) violating federal securities laws governing insider trading. Trump Media has also engaged in, and continues to engage in, unfair business practices in violation of the UCL.

**Unlawful Business Practices—Aiding and Abetting Violations of Section 9(a)**

51. Trump Media engaged in, and continues to engage in, unlawful business practices in violation of the UCL by violating federal ethics and anti-corruption law. Section 9(a) of the STOCK

Act prohibits any member of the executive branch, including the President, from "us[ing] nonpublic information derived from such person's position as an executive branch employee or gained from the performance of such person's official responsibilities as a means for making a private profit."

52. Federal guidance provides that Section 9(a) of "[t]he STOCK Act bars the President, the Vice President, and all executive branch employees from[] using nonpublic information for private profit."[33] This prohibition has the "same effect as the prohibition on the use of nonpublic information under the Standards of Ethical Conduct for Employees of the Executive Branch."

53. Trump Media aids, abets, assists, encourages, and knowingly facilitates violations by others, including Trump, of the STOCK Act and similar provisions of federal law by creating, pricing, marketing, and operating Truth API as a mechanism for monetizing Trump's disclosure of nonpublic information obtained by virtue of federal office as a means for his own and Trump Media's private profit. Trump Media conducts this business practice with actual knowledge that Trump has nonpublic information by virtue of his office; that he is entrusted with that information for use in the interests of the United States and not for private financial gain; that Truth API derives substantial commercial value from obtaining this nonpublic information from Trump and charging customers for preferential access to Trump's (and his staff's) disclosure of that information; and that revenues generated by Truth API financially benefit Trump. With actual knowledge of these facts, Trump Media intentionally created and operates Truth API for the purpose of unlawfully facilitating the conversion of nonpublic information obtained through government service into private financial gain for Trump Media, Trump, and his associates.

54. The conduct challenged here does not concern the President's exercise of authority on behalf of the United States, but rather the private business acts and practices by Trump Media to monetize nonpublic government information for private profit.

**Unlawful Business Practices—Insider Trading Laws**

55. Trump Media engaged in, and continues to engage in, unlawful business practices in violation of the UCL by violating insider trading laws, including Section 10(b) of the Securities

[33] OGE Legal Advisory LA-16-10, at 1 & n.3 (Dec. 15, 2016), https://perma.cc/D3MW-6C5X.

Exchange Act of 1934, 15 U.S.C. § 78j(b), Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, 18 U.S.C. § 2, 15 U.S.C. § 78u-1(h)(1), and 18 U.S.C. § 371.

56. Trump Media does so by agreeing to participate in a scheme and taking overt acts to further the scheme in which it misappropriates, in exchange for monetary benefit, material nonpublic information that it knows or should know is the result of a breach of the duty of trust and confidence to the government and/or the American people, to certain investors who pay for Truth API. Trump Media does so with the knowledge that the information will or reasonably could be expected to be used in connection with the purchase or sale of securities and/or commodities.

57. Accordingly, Trump Media engages in ongoing unlawful business practices in violation of the UCL.

**Unfair Business Practices**

58. Trump Media's actions are also unfair business practices under the UCL. "An 'unfair' business practice occurs when that practice offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Smith v. State Farm Mutual Auto. Ins. Co.*, 93 Cal. App. 4th 700, 719 (2001) (cleaned up). "The test of whether a business practice is unfair involves an examination of that practice's impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer. In brief, the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Id.* (cleaned up).

59. Trump Media's practice offends public policy and is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers because it converts the authority of public office to generate private monetary gain for a select few—including the very public office holder entrusted with that nonpublic information and/or material nonpublic information—at the expense of the general public.

60. Trump Media has expressly identified generating a recurring revenue stream and shareholder value as the purpose of Truth API.[34]

[34] Press Release, Trump Media & Tech. Grp. Corp., *Trump Media and Technology Group Launches Truth API, a New Licensed Data Service for Financial Services Partners That Provides the Fastest*

61. By monetizing information entrusted to federal officials in performance of their duties, Trump Media subverts the public interest. Its creation of information asymmetry in the markets—not limited to just the stock market but also markets for bonds, foreign exchange rates, commodities, cryptocurrency, and predictive markets—will directly harm anyone without early access to the nonpublic information.

62. Trump Media's practice also corrupts the incentives of investment firms, who must now decide whether to forgo the early access to market-moving information and thereby operate at a competitive disadvantage, or risk potential legal exposure to gain that advantage to compete with other investment firms.

63. Defendant has created a scheme to utilize Trump's access to nonpublic information and/or material nonpublic information for private gain. No other company can effectuate a similar scheme—or compete with Trump Media—because they lack the financial and contractual relationship with Trump.

64. No statute, regulation, or legal rule permits Trump Media's harmful practice.

65. Accordingly, Trump Media's conduct is an ongoing unfair and unlawful business practice in violation of the UCL.

66. The People are thus entitled to relief under California Business and Professions Code § 17200 *et seq.*

**Prayer For Relief**

The People request that this Court enter the following relief:

a. An order enjoining Trump Media from offering Truth API or any similar service in violation of California's Unfair Competition Law;

b. Assessed against Trump Media, a civil penalty of up to $2,500 for each violation of the UCL, pursuant to Business & Professions Code Section 17206(a);

c. The People's costs of this action, and any applicable interest; and

---

*Access to Truth Social's Most Influential Accounts* (July 16, 2026), https://perma.cc/CHN3-S684 ("[W]e expect Truth API to become a meaningful, ongoing source of revenue for the company, creating lasting value for shareholders.").

d. Any other and further relief under the applicable laws and as this Court may deem to be just and proper.

Dated: September 21, 2026

DAVID CHIU
City Attorney
YVONNE R. MERÉ
Chief Deputy City Attorney
SARA J. EISENBERG
Chief of Complex and Affirmative Litigation
ALEXANDER J. HOLTZMAN
MOLLY J. ALARCON
Deputy City Attorneys

By: *\/s/ David Chiu*
DAVID CHIU
City Attorney

MATTHEW J. PLATKIN*
ANGELA CAI*
AARON E. HAIER*
Platkin LLP

KYLE R. FREENY
NATHANIEL A.G. ZELINSKY*
Washington Litigation Group

NORMAN L. EISEN*
DAVID W. OGDEN*
CHRISTOPHER J. SWARTZ*
Democracy Defenders Fund

Attorneys for Plaintiff
THE PEOPLE OF THE STATE OF CALIFORNIA,
Acting by and through San Francisco City Attorney
DAVID CHIU

* *Pro Hac Vice applications forthcoming*

# EXHIBIT B

**CM-010**

ATTORNEY OR PARTY WITHOUT ATTORNEY STATE BAR NUMBER:
NAME: David Chiu, SBN 189542; Molly J. Alarcon, SBN 315244
FIRM NAME: San Francisco City Attorney's Office
STREET ADDRESS: 1390 Market Street, 7th Floor
CITY: San Francisco STATE: CA ZIP CODE: 94102
TELEPHONE NO.: (415) 554-3894 FAX NO.:
EMAIL ADDRESS: Molly.Alarcon@sfcityatty.org
ATTORNEY FOR (name): Plaintiff City and County of San Francisco

*FOR COURT USE ONLY*

ELECTRONICALLY
**FILED**
*Superior Court of California, County of San Francisco*
**09/21/2026**
**Clerk of the Court**
**BY: BENJAMIN YUST**
**Deputy Clerk**

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** San Francisco
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS: 400 McAllister Street
CITY AND ZIP CODE: San Francisco 94102
BRANCH NAME: Civic Center Courthouse

CASE NAME: People of the State of California v. Trump Media & Technology Group Corp., et al.

CASE NUMBER: **CGC-26-641192**

## CIVIL CASE COVER SHEET

- [X] **Unlimited** (Amount demanded exceeds $35,000)
- [ ] **Limited** (Amount demanded is $35,000 or less)

**Complex Case Designation**

- [ ] Counter
- [ ] Joinder

Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402)

JUDGE:
DEPT.:

*Items 1–6 below must be completed (see instructions on page 2 and examples on page 3).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Asbestos**
- [ ] Asbestos (04)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [X] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Song-Beverly Act: Motor Vehicle Lemon Law (49)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Employment Development Department (EDD)**
- [ ] EDD decision review (48)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Comprehensive groundwater adjudication (47)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition *(not specified above)* (43)



CEB ceb.com Essential Forms

2. Is this case complex under rule 3.400 of the California Rules of Court? [X] Yes [ ] No
   If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [X] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [X] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [X] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):*
   a. [X] monetary
   b. [X] nonmonetary; declaratory or injunctive relief
   c. [ ] punitive

4. Number of causes of action *(specify):* 1

5. Is this case a class action suit? [ ] Yes [X] No

6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: September 21, 2026

Molly J. Alarcon — /s/ Molly J. Alarcon

Type or print name — Signature of party or attorney for party

**NOTICE**

- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, or a collections case under rule 3.740, you must serve a copy of this cover sheet on all other parties to the action or proceeding. (Cal. Rules of Court, rule 3.220.)
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on pages 1 and 2. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided on page 3 of this form. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 of the California Rules of Court is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $35,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

**SEE PAGE 3 FOR INFORMATION PURPOSES ONLY.**



CEB Essential Forms ceb.com

## CASE TYPES AND EXAMPLES

The list below provides explanations and examples for the case type checkboxes listed in item 1 on this form. The lists of examples below are not meant to be exhaustive, and some case types may have causes of action not listed here.

**Auto Tort**
- Auto (22)–Personal Injury/Property Damage/ Wrongful Death
- Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)* \

**Asbestos**
- Asbestos (04)
  - Asbestos Property Damage
  - Asbestos Personal Injury/Wrongful Death

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
- Product Liability *(not asbestos or environmental/toxic tort)* (24)
- Medical Malpractice (45)
  - Medical Malpractice–Physicians & Surgeons
  - Other Professional Health Care Malpractice
- Other PI/PD/WD (23)
  - Premises Liability (e.g., slip and fall)
  - Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  - Intentional Infliction of Emotional Distress
  - Negligent Infliction of Emotional Distress
  - Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
- Business Tort/Unfair Business Practice (07)
- Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
- Defamation (e.g., slander, libel) (13)
- Fraud *(other than contract)* (16)
- Intellectual Property (19)
- Professional Negligence (25)
  - Legal Malpractice
  - Other Professional Malpractice *(not medical)*
- Other Non-PI/PD/WD Tort (35)

**Employment**
- Wrongful Termination (36)
- Other Employment (15)

**Contract**
- Breach of Contract/Warranty (06)
  - Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  - Contract/Warranty Breach–Seller Plaintiff *(not fraud)*
  - Negligent Breach of Contract/Warranty
  - Other Breach of Contract/Warranty
- Song-Beverly Act: Motor Vehicle Lemon Law *(check this item if the case involves a Song-Beverly Act claim regarding a motor vehicle)* (49)
- Rule 3.740 Collections *(as defined in Cal. Rules of Court, rule 3.740(a))* (09)
- Other Collections (e.g., money owed, open book accounts, promissory note) (09)
- Insurance Coverage *(not provisionally complex)* (18)
  - Auto Subrogation
  - Other Coverage
- Other Contract (37)
  - Contractual Fraud
  - Other Contract Dispute

**Real Property**
- Eminent Domain/Inverse Condemnation (14)
- Wrongful Eviction (33)
- Other Real Property (e.g., quiet title) (26)
  - Writ of Possession of Real Property
  - Mortgage Foreclosure
  - Quiet Title
  - Other Real Property *(not unlawful detainer)*

**Unlawful Detainer**
- Commercial (31)
- Residential (32)
- Drugs *(if the case involves illegal drugs, check this item; otherwise, choose Commercial or Residential)* (38)

**Judicial Review**
- Asset Forfeiture (05)
- Petition Re: Arbitration Award (11)
- Writ of Mandate (02)
  - Writ–Administrative Mandamus
  - Writ–Mandamus on Limited Court Case Matter
  - Writ–Other Limited Court Case Review
- Other Judicial Review (39)
  - Review of Health Officer Order
  - Notice of Appeal–Labor Commissioner Appeals

**Employment Development Department (EDD)**
- EDD Decision Review *(if the case involves an Employment Development Department decision, check this item instead of wrongful termination or other employment)* (48)

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.404)**
- Antitrust/Trade Regulation (03)
- Construction Defect (10)
- Mass Tort (40)
- Securities Litigation (28)
- Environmental/Toxic Tort (30)
- Comprehensive Groundwater Adjudication (47)
- Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
- Enforcement of Judgment (20)
  - Abstract of Judgment (Out of County)
  - Confession of Judgment *(non-domestic relations)*
  - Sister-State Judgment
  - Administrative Agency Award
  - Petition/Certification of Entry of Judgment on Unpaid Taxes
  - Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
- RICO (27)
- Other Complaint *(not specified above)* (42)
  - Declaratory Relief Only
  - Injunctive Relief Only *(non-harassment)*
  - Mechanic's Lien
  - Other Commercial Complaint Case *(non-tort/non-complex)*
  - Other Civil Complaint *(non-tort/ non-complex)*

**Miscellaneous Civil Petition**
- Partnership and Corporate Governance (21)
- Other Petition *(not specified above)* (43)
  - Civil Harassment
  - Workplace Violence
  - Elder/Dependent Adult Abuse
  - Election Contest
  - Petition for Name Change
  - Petition for Relief From Government Claim Requirement
  - Other Civil Petition



CEB ceb.com | Essential Forms

# NOTICE TO PLAINTIFF

A Case Management Conference is set for:

**DATE:** **MAR 10, 2027**

**TIME:** **10:30 am**

**PLACE:** **Department 610**
**400 McAllister Street**
**San Francisco, CA 94102-3680**

All parties must appear and comply with Local Rule 3.

CRC 3.725 requires the filing and service of a case management statement form CM-110 no later than 15 days before the case management conference. However, it would facilitate the issuance of a case management order **without an appearance** at the case management conference if the case management statement is filed and served twenty-five days before the case management conference.

Plaintiff must serve a copy of this notice upon each party to this action with the summons and complaint. Proof of service subsequently filed with this court shall so state. **This case is eligible for electronic filing and service per Local Rule 2.11. For more information, please visit the Court's website at https://sf.courts.ca.gov under Online Services.**

**[DEFENDANTS: Attending the Case Management Conference does not take the place of filing a written response to the complaint. You must file a written response with the court within the time limit required by law. See Summons.]**

## ALTERNATIVE DISPUTE RESOLUTION REQUIREMENTS

**IT IS THE POLICY OF THE SUPERIOR COURT THAT EVERY CIVIL CASE SHOULD PARTICIPATE IN MEDIATION, ARBITRATION, NEUTRAL EVALUATION, AN EARLY SETTLEMENT CONFERENCE, OR OTHER APPROPRIATE FORM OF ALTERNATIVE DISPUTE RESOLUTION PRIOR TO A TRIAL.**

(SEE LOCAL RULE 4)

Plaintiff **must** serve a copy of the Alternative Dispute Resolution (ADR) Information Package on each defendant along with the complaint. (CRC 3.221.) The ADR package may be accessed at https://sf.courts.ca.gov/divisions/civil-division/alternative-dispute-resolution or you may request a paper copy from the filing clerk. All counsel must discuss ADR with clients and opposing counsel and provide clients with a copy of the ADR Information Package prior to filing the Case Management Statement.

**Superior Court Alternative Dispute Resolution Administrator**
**400 McAllister Street, Room 103-A**
**San Francisco, CA 94102**
**adrcoordinator@sftc.org**

**See Local Rules 3.3, 6.0 C and 10 B re stipulation to judge pro tem.**

# Superior Court of California, County of San Francisco
## Information Sheet
## Voluntary Expedited Jury Trial Summary

The San Francisco Superior Court encourages the use of Voluntary Expedited Jury Trials ("EJTs") in appropriate cases. EJTs provide an excellent opportunity to resolve your client's case in an expeditious and inexpensive way. Voluntary EJTs are authorized by statute. CCP §§ 630.01.

EJTs can resolve your entire case **or** a single important case critical issue that, once adjudicated, can promote resolution of the entire case (for example: course and scope of employment, causation of an injury, whether a contract was formed, etc.) EJTs promote equal access to civil justice as they are less expensive, consume fewer courtroom days, provide flexibility throughout, encourage high/low agreements to limit risk, and feature streamlined pre-trial procedures.

These are highlights of an EJT (C.C.P. §§ 630.01 et seq. and Rules of Court 3.1549 - 3.1553):

- Parties encouraged to submit a joint jury questionnaire;
- 8 jurors (6 must agree);
- 3 peremptory challenges per side;
- 5-hour time limit per side unless agreed otherwise and approved;
- One to two court days completion unless agreed otherwise and approved;
- Option to present evidence by stipulation and objection;
- High/low arrangement option;
- Limited appeal (misconduct by judge or jury substantially affecting parties' rights or corruption, or bad faith.)

If the parties agree to the Voluntary EJT, they should file and serve the completed and signed (Proposed) Consent Order for Voluntary Expedited Jury Trial, Judicial Council Form EJT-020.

DAVID CHIU, SBN 189542
City Attorney
YVONNE R. MERÉ, SBN 173594
Chief Deputy City Attorney
SARA J. EISENBERG, SBN 269303
Chief of Complex and Affirmative Litigation
ALEXANDER J. HOLTZMAN, SBN 311813
MOLLY J. ALARCON, SBN 315244
Deputy City Attorneys
Fox Plaza
1390 Market Street, 7th Floor
San Francisco, CA 94102-5408
Telephone: (415) 554-3800
Facsimile: (415) 554-3837
E-Mail: Alexander.Holtzman@sfcityatty.org
Molly.Alarcon@sfcityatty.org

Attorneys for Plaintiff
THE PEOPLE OF THE STATE OF CALIFORNIA, acting by and through San Francisco City Attorney DAVID CHIU

ELECTRONICALLY
**FILED**
*Superior Court of California, County of San Francisco*
**10/08/2026**
**Clerk of the Court**
**BY: JEFFREY FLORES**
**Deputy Clerk**

**EXEMPT FROM FILING FEES PURSUANT TO GOVERNMENT CODE SECTION 6103**

*[Additional counsel on next page]*

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO

UNLIMITED JURISDICTION

THE PEOPLE OF THE STATE OF CALIFORNIA, acting by and through San Francisco City Attorney DAVID CHIU,

Plaintiff,

vs.

TRUMP MEDIA & TECHNOLOGY GROUP CORP., DOES 1-100,

Defendants.

Case No. CGC-26-641192

**PLAINTIFF PEOPLE OF THE STATE OF CALIFORNIA'S NOTICE OF APPLICATION AND APPLICATION FOR COMPLEX DESIGNATION**

Date Action Filed: September 21, 2026
Trial Date: N/A

MATTHEW J. PLATKIN*
ANGELA CAI*
AARON E. HAIER*
Platkin LLP
1 Gateway Center #1150
Newark, NJ 07102
Telephone: (973) 561-1950
E-Mail: mplatkin@platkinllp.com
acai@platkinllp.com
ahaier@platkinllp.com

KYLE R. FREENY, SBN 247857
NATHANIEL A.G. ZELINSKY*
Washington Litigation Group
1717 K Street NW
Washington, DC 20006
Telephone: (202) 521-8750
E-Mail: kfreeny@washingtonlitigationgroup.org
nzelinsky@washingtonlitigationgroup.org

NORMAN L. EISEN*
DAVID W. OGDEN*
CHRISTOPHER J. SWARTZ*
Democracy Defenders Fund
600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003
Telephone: (202) 594-9958
E-Mail: norman@democracydefenders.org
david@democracydefenders.org
chris@democracydefenders.org

* *Pro Hac Vice applications forthcoming*

## NOTICE OF APPLICATION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT, pursuant to California Rules of Court, rule 3.403(b), and Local Rules of Court for the San Francisco Superior Court, rule 3.5(C)(2), Plaintiff the People of the State of California, acting by and through San Francisco City Attorney David Chiu ("the People"), seek an Order designating the above-captioned civil case as a "complex case" under California Rules of Court, rule 3.400 *et seq.*, and assigning the case to the Court's Complex Civil Litigation Departments. This application is made on the grounds that this case will require exceptional judicial management to avoid placing unnecessary burdens on the Court or the litigants, and to expedite the case, keep costs reasonable, and promote effective decision-making by the Court, the parties, and counsel. Cal. Rules of Court, rule 3.400(a). This application is based on this Notice and Application and the complaint on file. Defendant Trump Media & Technology Group Corp. has not yet appeared.

## APPLICATION FOR COMPLEX DESIGNATION

This civil enforcement action seeks to hold Defendant Trump Media & Technology Group Corp. ("Trump Media") accountable for creating a corrupt business scheme that monetizes preferential access to non-public government information in violation of the Unfair Competition Law, California Business and Professions Code section 17200 *et seq*. This enforcement action should be designated as a "complex case" under California Rules of Court, rule 3.400, because "exceptional judicial management" would facilitate timely, efficient resolution of the case. Specifically, complex management is necessary because the action will likely involve: (1) Numerous pretrial motions raising difficult or novel legal issues that will be time-consuming to resolve; (2) substantial documentary evidence; and (3) Court oversight and supervision of a permanent injunction should the People prevail.

### I. BACKGROUND

On September 21, 2026, the People, by and through San Francisco City Attorney David Chiu, filed this action against Trump Media.

As alleged in the People's complaint, Trump Media operates the social-media platform Truth Social. Compl. ¶ 1. On August 1, 2026, Trump Media launched "Truth API," a paid data service that

claims to give subscribers faster access to posts from the ten most influential Truth Social accounts, including the account of President Donald Trump, for a price of $100,000 per month or $60,000 per month with a three-year commitment. Compl. ¶¶ 22-24, 28. This business arrangement gives subscribers advanced access to nonpublic information posted by Trump and other high-ranking officials. Meanwhile, the subscription fees create a private profit for Trump, who is Trump Media's largest shareholder through a revocable trust for which he is the sole beneficiary.

Trump regularly posts market-moving information on Truth Social—including his April 9, 2025 post about pausing tariffs, which caused a surge in the stock market; his May 23, 2025 post about greenlighting a Japanese company's investment in U.S. Steel, which caused U.S. Steel's stock price to rise by 22.5%; his January 8, 2026 post sharing results from the Bureau of Labor Statistics ("BLS") monthly jobs report 12 hours before their official release; and his posts about the war in Iran, which have triggered immediate fluctuations in oil and gas prices. Compl. ¶ 21. Trump Media reported that at least ten customers, mostly high frequency trading firms, have signed up for Truth API. Compl. ¶ 27. Truth API claims to deliver posts at a "50 millisecond advantage" to these customers, which gives them the opportunity to react to and trade on market-moving information before other market participants. Compl. ¶¶ 32-33.

Defendant's conduct is unlawful and unfair, in violation of the Unfair Competition Law ("UCL"), California Business and Professions Code section 17200 *et seq*. Specifically, Trump Media's conduct is unlawful under the UCL because it aids and abets a violation of Section 9(a) of the STOCK Act, which prohibits executive branch officials, including the President, from using "nonpublic information derived from such person's position as an executive branch employee or gained from the performance of such person's official responsibilities as a means for making a private profit." Pub. L. No. 112-105, §§ 9(a), 2(3); *see* Compl. ¶ 40. Trump Media knowingly and intentionally facilitates this prohibited conduct by creating a platform for Trump to monetize nonpublic information derived from his position and performance of official responsibilities for the company's and his own private profit. Compl. ¶ 40.

Separately, Trump Media's conduct is unlawful under the UCL because it violates prohibitions

against insider trading, including Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, and the anti-conspiracy laws, 18 U.S.C. § 371. These laws collectively prohibit trading on, or facilitating others' trading on, material nonpublic information that has been knowingly misappropriated, or conspiring or attempting to do the same. Compl. ¶ 41. Section 9(b) of the STOCK Act, 15 U.S.C. § 78u-1(h)(1), makes clear that insider trading laws apply to executive branch employees who owe a "duty arising from a relationship of trust and confidence to the United States Government and the citizens of the United States with respect to material, nonpublic information derived from such person's position . . . or gained from the performance of such person's official responsibilities." Compl. ¶ 41.

Trump Media's conduct is also unfair in violation of the UCL because it harms ordinary market participants but offers no legitimate social utility and offends established public policy by violating the fundamental anticorruption principle that nonpublic government information may not be used for private profit. Compl. ¶ 42.

The People seek permanent injunctive relief and civil penalties.

## II. ARGUMENT

### A. Legal Standard

California Rules of Court, rule 3.400(a), defines a "complex case" as "an action that requires exceptional judicial management to avoid placing unnecessary burdens on the court or the litigants and to expedite the case, keep costs reasonable, and promote effective decision making by the court, the parties, and counsel." California Rules of Court, rule 3.400(b), instructs courts to consider, "among other things," whether the case is "likely to involve":

1) Numerous pretrial motions raising difficult or novel legal issues that will be time-consuming to resolve;

2) Management of a large number of witnesses or a substantial amount of documentary evidence;

3) Management of a large number of separately represented parties;

4) Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court; or

5) Substantial postjudgment judicial supervision.

The presence of each factor is not necessary for a case to be designated complex; a single factor can be sufficient to merit complex designation. *See Ford Motor Warranty Cases*, 11 Cal. App. 5th 626, 641 (2017) (citing *Thayer v. Wells Fargo Bank*, 92 Cal. App. 4th 819, 835, fn. 8 (2001)). Here, complex designation is warranted because this case will require resolving novel legal questions in the pretrial phase, management of a substantial amount of documentary evidence, and, should the People prevail, substantial post judgment judicial supervision.

**B. Pretrial Motions Will Involve Novel Legal and Factual Issues that Will be Time Consuming to Resolve.**

Pretrial motions in this case will likely involve novel and complex issues. Such pretrial motions may dispose of issues or define the contours of the eventual bench trial on the merits. The People anticipate that Trump Media's novel scheme will raise at least two complex issues of fact and law. First, this case will involve highly technical *factual* issues relating to Trump Media's unprecedented scheme, which delivers market-moving information directly to algorithmic trading systems 50 milliseconds ahead of when that information appears to the public. While this advantage may seem trivial to ordinary people, it is enough time for certain investors, including high-frequency trading systems, to execute lucrative transactions. Resolving factual disputes in this case may require parsing technical documentary evidence, including voluminous financial records, and expert reports.

Second, this case may raise novel and complex *legal* questions. For example, the "independent 'unfairness' prong of the UCL is intentionally broad, thus allowing courts maximum discretion to prohibit new schemes to defraud." *Schnall v. Hertz Corp.*, 78 Cal. App. 4th 1144, 1166 (2000) (cleaned up). The precise test that courts should apply to determine whether a business has perpetrated an unfair business practice on consumers, though, remains somewhat unsettled following the Supreme Court's ruling about the standard applying to UCL cases brought by competitors in *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163 (1999). Some courts have held that "the public policy which is a predicate to the action must be 'tethered' to specific constitutional, statutory or regulatory provisions." *Gregory v. Albertson's, Inc.*, 104 Cal. App. 4th

845, 854 (2002). Other courts have applied a test balancing “the impact of the practice or act on its victim” against “justifications and motives of the alleged wrongdoer.” *Progressive W. Ins. Co. v. Super. Ct.*, 135 Cal. App. 4th 263, 285 (2005). Still other courts have found a need for “offensive unfair business practices” to be “injurious in some causative way to consumers.” *In re Firearm Cases*, 126 Cal. App. 4th 959, 981 (2005). The People believe that Truth API violates all these standards such that the Court will not need to adjudicate the standard that applies, but arguments to the contrary by Truth Social may result in complex legal questions for the Court’s resolution, affecting both motions practice and a bench trial.

**C. This Case Will Likely Involve a Substantial Amount of Documentary Evidence.**

The People anticipate that a substantial amount of documentary evidence in this case will be relevant to the People’s claims. For example, substantial documentary evidence will be required to demonstrate the market advantage provided by Truth API to subscribers. Truth API claims to provide Truth Social posts in a format capable of feeding directly into algorithmic trading systems, with a 50-millisecond head start on the general public. This allows firms to deploy automated systems to execute trades of securities, commodities, and other instruments, that take advantage of the non-public nature of the information channeled to them by Truth API. Compl. ¶¶ 30, 32. Additional substantial discovery and expert work will likely be required, including related to Trump Media’s agreements with Truth API subscribers, financial markets, high-frequency trading algorithms, the inner mechanics of Truth API’s service, and Truth API’s outreach to and potential agreements with hyperscalers, news organizations, cryptocurrency firms, and artificial intelligence companies. Compl. ¶ 27.

California Rules of Court, rule 3.400(b)(2), therefore additionally supports designating this case as complex.

**D. This Case Will Likely Involve Substantial Post-Judgment Supervision**

The People seek to permanently enjoin Trump Media’s misconduct, and effectuating this relief may require significant post-judgment supervision by the Court. Due to the 50-millisecond information access advantage at issue—one not capable of being detected except by specialized equipment—verifying Trump Media’s compliance with Court orders may require oversight and

intervention.

California Rules of Court, rule 3.400(b)(5), further supports designating this case as complex.

## III. CONCLUSION

For these reasons, the People respectfully request this action be designated a "complex case" under California Rules of Court, rule 3.400.

Dated: October 8, 2026

DAVID CHIU
City Attorney
YVONNE R. MERÉ
Chief Deputy City Attorney
SARA J. EISENBERG
Chief of Complex and Affirmative Litigation
ALEXANDER J. HOLTZMAN
MOLLY J. ALARCON
Deputy City Attorneys

By: *<u>/s/ Alexander J. Holtzman</u>*
ALEXANDER J. HOLTZMAN
Deputy City Attorney

MATTHEW J. PLATKIN*
ANGELA CAI*
AARON E. HAIER*
Platkin LLP

KYLE R. FREENY
NATHANIEL A.G. ZELINSKY*
Washington Litigation Group

NORMAN L. EISEN*
DAVID W. OGDEN*
CHRISTOPHER J. SWARTZ*
Democracy Defenders Fund

Attorneys for Plaintiff
THE PEOPLE OF THE STATE OF CALIFORNIA,
Acting by and through San Francisco City Attorney
DAVID CHIU

* *Pro Hac Vice applications forthcoming*

SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

***FOR COURT USE ONLY***
***(SOLO PARA USO DE LA CORTE)***

**NOTICE TO DEFENDANT:**
***(AVISO AL DEMANDADO):***
Trump Media & Technology Group Corp., Does 1-100

**YOU ARE BEING SUED BY PLAINTIFF:** People of the State of California, acting by and through San Francisco City Attorney David Chiu

***(LO ESTÁ DEMANDANDO EL DEMANDANTE):***

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center *(www.courtinfo.ca.gov/selfhelp)*, your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site *(www.lawhelpcalifornia.org)*, the California Courts Online Self-Help Center *(www.courtinfo.ca.gov/selfhelp)*, or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

***¡AVISO!** Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California* (www.sucorte.ca.gov), *en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services,* (www.lawhelpcalifornia.org), *en el Centro de Ayuda de las Cortes de California,* (www.sucorte.ca.gov) *o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*
San Francisco Superior Court
400 McAllister Street, San Francisco, CA 94102

CASE NUMBER
*(Número del Caso):*
**CGC-26-641192**

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Molly J. Alarcon, Deputy City Attorney
1390 Market Street, 7th Floor, San Francisco, CA 94102
(415) 554-3800

DATE: **10/16/2026** Clerk, by **JAMES FORONDA**, Deputy
*(Fecha)* *(Secretario)* *(Adjunto)*

*(For proof of service of this summons, use* Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario* Proof of Service of Summons, *(POS-010)).*

[SEAL] SUPERIOR COURT OF CALIFORNIA · EUREKA · COUNTY OF SAN FRANCISCO

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):*
   under: ☒ CCP 416.10 (corporation) ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*



CEB® ceb.com Essential Forms™

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF SAN FRANCISCO

400 MCALLISTER STREET, SAN FRANCISCO, CA 94102-4514

THE PEOPLE OF THE STATE OF CALIFORNIA, ACTING BY

PLAINTIFF (S)

VS.

TRUMP MEDIA & TECHNOLOGY GROUP CORP. et al

DEFENDANT (S)

**Department 613**

**NO.: CGC-26-641192**

**Dept 613 Order Granting Complex Designation And For Single Assignment**

TO: ALL COUNSEL AND PARTIES IN PROPRIA PERSONA:

The Application for Approval of Complex Designation filed Oct-08-2026 is GRANTED. The Court finds this action to be complex under Rule 3.400 et seq. of the California Rules of Court.

IT IS HEREBY ORDERED this action is singly assigned for all purposes to Complex Litigation Department 613, the Hon. JEFFREY S. ROSS, Judge of the California Superior Court, County of San Francisco at 400 McAllister Street, San Francisco, CA 94102.

The Mar-10-2027 CASE MANAGEMENT CONFERENCE in Dept. 610 is VACATED. Any pending hearings in the Law & Motion/Discovery Department should be taken off calendar and two sets of courtesy copies of motion papers forwarded to Dept. 613 for future re-setting.

An initial case management conference is set for Dec-14-2026 at 9:00 am in Department 613. A JOINT CASE MANAGEMENT STATEMENT must be filed and two sets of courtesy copies thereof delivered to Department 613 no later than five (5) court days before the case management conference. Before the initial case management conference, the parties are ordered to meet and to comply with California Rules of Court, Rule 3.750(b) and (d). After counsel meet, the parties shall include the following in the JOINT CASE MANAGEMENT STATEMENT: those issues in California Rules of Court, Rule 3.750(b), which are agreed upon and those which the court must rule on at the conference; the parties' claims and defenses; a description of the major factual and legal issues pursuant to Rule 3.750(d); and the Rule 3.750(b) subjects. The caption for joint case management conference statements shall include the date and time for the conference.

All counsel should read and be familiar with the department procedures, which are located online at: https://sf.courts.ca.gov/divisions/civil-division/complex-civil-litigation.

Counsel for plaintiff shall provide notice of this order and notice to all counsel of record and/or parties In Propria Persona that are not listed in the certificate of service.

This case is subject to mandatory e-filing and e-service pursuant to Local Rule 2.11. The e-filing vendor for the Complex Department is File&ServeXpress. Counsel must submit all filings to this e-service. Counsel must also add themselves to the e-service list. For assistance contact support@fileandservexpress.com or call 888-529-7587.

DATED: OCT-26-2026

Jeffrey Ross

JUDGE

CERTIFICATE OF SERVICE BY MAIL

I, the undersigned, certify that I am an employee of the Superior Court of California, County of San Francisco and not a party to the above-entitled cause and that on OCT-26-2026 I served the attached Dept 613 Order Granting Complex Designation And For Single Assignment by placing a copy thereof in an envelope addressed to all parties to this action as listed below. I then placed the envelope in the outgoing mail at 400 McAllister Street, San Francisco, CA 94102, on the date indicated above for collection, sealing of the envelope, attachment of required prepaid postage, and mailing on that date, following standard court practice.

Dated : OCT-26-2026 By: SEAN KANE

DAVID CHIU (189542)
CITY ATTORNEY
1390 MARKET STREET
SEVENTH FLOOR
SAN FRANCISCO, CA 94102-5408

# EXHIBIT C

THE SUPERIOR COURT OF CALIFORNIA
COUNTY OF SAN FRANCISCO

Case Number: CGC26641192
Title: THE PEOPLE OF THE STATE OF CALIFORNIA, ACTING BY VS. TRUMP MEDIA & TECHNOLOGY GROUP CORP. ET AL
Cause of Action: BUSINESS TORT
Generated: 2026-11-18 3:28 pm



**Please Note: The "View" document links on this web page are valid until 3:38:13 pm**
**After that, please refresh your web browser. (by pressing Command +R for Mac, pressing F5 for Windows or clicking the refresh button on your web browser)**

# Register of Actions

Show 10 entries Search:

| Date | Proceedings | Document | Fee |
|---|---|---|---|
| 2026-10-26 | ORDER GRANTING COMPLEX DESIGNATION AND FOR SINGLE ASSIGNMENT TO JUDGE JEFFREY S. ROSS FOR ALL PURPOSES. CASE MANAGEMENT CONFERENCE SET FOR DEC-14-2026 AT 9:00 AM IN DEPT. 613. MAR-10-2027 CASE MANAGEMENT CONFERENCE IS OFF CALENDAR. NOTICE SENT BY COURT. | View | |
| 2026-10-16 | SUMMONS ISSUED (TRANSACTION ID # 80832307) TO PLAINTIFF THE PEOPLE OF THE STATE OF CALIFORNIA, ACTING BY AND THROUGH SAN FRANCISCO CITY ATTORNEY DAVID CHIU | View | |
| 2026-10-08 | APPLICATION FOR APPROVAL OF COMPLEX LITIGATION DESIGNATION (TRANSACTION ID # 80992409) FILED BY PLAINTIFF THE PEOPLE OF THE STATE OF CALIFORNIA, ACTING BY AND THROUGH SAN FRANCISCO CITY ATTORNEY DAVID CHIU | View | EXEMPT |
| 2026-09-21 | NOTICE TO PLAINTIFF | View | |
| 2026-09-21 | CIVIL CASE COVERSHEET FILED (TRANSACTION ID # 80698902) FILED BY PLAINTIFF THE PEOPLE OF THE STATE OF CALIFORNIA, ACTING BY AND THROUGH SAN FRANCISCO CITY ATTORNEY DAVID CHIU CASE DESIGNATED COMPLEX LITIGATION | View | |
| 2026-09-21 | BUSINESS TORT, COMPLAINT (TRANSACTION ID # 80698902) FILED BY PLAINTIFF THE PEOPLE OF THE STATE OF CALIFORNIA, ACTING BY AND THROUGH SAN FRANCISCO CITY ATTORNEY DAVID CHIU AS TO DEFENDANT TRUMP MEDIA & TECHNOLOGY GROUP CORP. DOES 1-100 NO SUMMONS ISSUED, JUDICIAL COUNCIL CIVIL CASE COVER SHEET NOT FILED CASE MANAGEMENT CONFERENCE SCHEDULED FOR MAR-10-2027 PROOF OF SERVICE DUE ON DEC-04-2026 CASE MANAGEMENT STATEMENT DUE ON FEB-16-2027 COMPLEX LITIGATION ASSIGNMENT REQUESTED BY FILING PARTIES; FEE INCLUDED IN FILING FEE | View | EXEMPT |

Showing 1 to 6 of 6 entries