AMANDA L. MORGAN (SBN 246277)
amanda.morgan@us.dlapiper.com
**DLA PIPER LLP (US)**
555 Mission St., Suite 2400
San Francisco, CA 94105
Tel.: (415) 615-6058 | Fax: (415) 659-7358

CARYN G. SCHECHTMAN (*Pro Hac Vice forthcoming*)
caryn.schechtman@us.dlapiper.com
**DLA PIPER LLP (US)**
1251 Avenue of the Americas, 27th Floor
New York, NY 10020
Tel.: (212) 335-4500 | Fax: (212) 335-4501

*Attorneys for Defendant*
*Trump Media & Technology Group Corp.*

[*Additional counsel on next page*]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

THE PEOPLE OF THE STATE OF CALIFORNIA, acting by and through San Francisco City Attorney DAVID CHIU,

Plaintiff,

vs.

TRUMP MEDIA & TECHNOLOGY GROUP CORP., DOES 1-100,

Defendants.

Case No.: 26-CV-14132

Superior Court No.: CGC-26-641192

TRUMP MEDIA & TECHNOLOGY GROUP CORP.'S MOTION TO DISMISS COMPLAINT AND, IN THE ALTERNATIVE, TRANSFER VENUE PURSUANT TO 28 U.S.C. § 1404

[*Proposed Order filed concurrently*]

Judge: Hon. Peter H. Kang
Courtroom: F, 15th Floor (San Francisco)
Date: TBD upon reassignment
Time: TBD upon reassignment
Complaint Filed: September 21, 2026

ERIC FORNI (*Pro Hac Vice forthcoming*)
eric.forni@us.dlapiper.com
**DLA PIPER LLP (US)**
33 Arch Street, 26th Floor
Boston, MA 02110
Tel.: (617) 406-6000

RACHEL A.H. HORTON (*Pro Hac Vice forthcoming*)
rachel.horton@us.dlapiper.com
MICHAEL GNIWISCH (SBN 348762) (*Pro Hac Vice forthcoming*)
michael.gniwisch@us.dlapiper.com
**DLA PIPER LLP (US)**
1650 Market St., Suite 500
Philadelphia, PA 19103
Tel.: (215) 656-3300

NOORVIK MINASIAN (SBN 332883)
noorvik.minasian@us.dlapiper.com
**DLA PIPER LLP (US)**
2000 Avenue of the Stars, Suite 400
Los Angeles, CA 90067
Tel.: (310) 595-3000

SETH BILLINGSLEY (*Pro Hac Vice forthcoming*)
seth.billingsley@us.dlapiper.com
**DLA PIPER LLP (US)**
1900 N. Pearl Street, Suite 2200
Dallas, TX 75201
Tel.: (214) 743-4536

JOSH HALPERN (*Pro Hac Vice forthcoming*)
jhalpern@jhlegalpllc.com
**JH Legal PLLC**
1100 H Street NW, Suite 840
Washington, DC 20005
Tel.: (610) 405-5531

*Attorneys for Defendant*
*Trump Media & Technology Group Corp.*

## NOTICE OF MOTION AND MOTION TO DISMISS

**PLEASE TAKE NOTICE** that on January 7, 2027, at 1:30 p.m., or as soon thereafter as the matter may be heard before the Honorable Peter H. Kang, United States Magistrate Judge, Northern District of California, located at the Phillip Burton Federal Building and United States Courthouse, Courtroom F, 450 Golden Gate Avenue, 15th Floor, San Francisco, CA 94102, Defendant Trump Media & Technology Group Corp. ("TMTG") will, and hereby does, move to dismiss Plaintiff's Complaint ("Complaint") and, in the alternative, transfer this case to the U.S. District Court for the Middle District of Florida.[1]

The Motion is based on this Notice of Motion and Motion to Dismiss, the supporting Memorandum of Points and Authorities, Request for Judicial Notice, Declaration of Amanda L. Morgan, all pleadings and papers on file in this matter, and such other and further evidence and argument as may be presented at the time of the hearing or otherwise.

Dated: November 25, 2026

**DLA PIPER LLP (US)**

By: */s/ Amanda L. Morgan*
AMANDA L. MORGAN
Attorneys for Defendant
TRUMP MEDIA &
TECHNOLOGY GROUP CORP.

---

[1] TMTG exercises its right to decline the assignment of the Honorable Peter H. Kang. (Dkt. 5.) TMTG submits its declination concurrently with this motion. TMTG will re-notice the Motion to Dismiss Complaint and, in the Alternative, Transfer Venue Pursuant to 28 U.S.C. § 1404 consistent with the schedule and policies of the newly assigned Judge.

# TABLE OF CONTENTS

PAGE


I. INTRODUCTION ..... 1

II. BACKGROUND ..... 2

- A. Truth Social and Truth API ..... 2
- B. Plaintiff's Mischaracterization of Truth API ..... 3
- C. Plaintiff's UCL Claim and Requested Relief ..... 4

III. LEGAL STANDARDS ..... 4

IV. ARGUMENT ..... 5

- A. By Its Terms, Section 230 Expressly Preempts Plaintiff's Claims. ..... 5
  - 1. TMTG Provides Interactive Computer Services. ..... 6
  - 2. Plaintiff's Claims Treat TMTG as a Publisher. ..... 7
  - 3. Plaintiff's Claims Depend on Content Provided by Others. ..... 8
- B. Plaintiff Cannot State a Claim Under the UCL. ..... 8
  - 1. The UCL, a Little FTC Statute, Does Not Reach Securities Transactions. ..... 9
  - 2. Plaintiff Fails to Plausibly Plead a Violation of the STOCK Act. ..... 10
  - 3. Plaintiff Fails to Plausibly Plead the President or TMTG Violated Insider Trading Laws. ..... 13
  - 4. Plaintiff's Unfair Theory Fails Because It Is Based on the Same Conduct as the Unlawful Theory. ..... 21
- C. Alternatively, the Court Should Transfer This Action. ..... 21

V. CONCLUSION ..... 22

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Small*,
No. D054402, 2009 WL 3808295 (Cal. Ct. App. Nov. 16, 2009) .......... 10

*In re Archegos 20A Litig.*,
156 F.4th 108 (2d Cir. 2025) .......... 20

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 4

*Barnes v. Yahoo!, Inc.*,
570 F.3d 1096 (9th Cir. 2009) .......... 1, 6, 7, 8

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 4

*Berryman v. Merit Prop. Mgmt., Inc.*,
152 Cal. App. 4th 1544 (2007) .......... 5

*Bowen v. Ziasun Techs., Inc.*,
116 Cal. App. 4th 777 (2004) .......... 1, 9, 10

*Brady v. Von Drehle Corp.*,
No. 14-CV-01732, 2014 WL 4243254 (N.D. Cal. Aug. 26, 2014) .......... 22

*Central Bank, N.A. v. First Interstate Bank, N.A.*,
511 U.S. 164 (1994) .......... 18, 19

*Chiarella v. United States*,
445 U.S. 222 (1980) .......... 17, 20

*City Sols., Inc. v. Clear Channel Commc'ns, Inc.*,
201 F. Supp. 2d 1048 (N.D. Cal. 2002) .......... 20

*Cont'l Auto. Sys. v. Avanci, LLC*,
No. 19-CV-02520, 2019 WL 6735604 (N.D. Cal. Dec. 11, 2019) .......... 22

*Dirks v. SEC*,
463 U.S. 646 (1983) .......... 20

*Doe 1 v. Meta Platforms, Inc.*,
174 F.4th 1159 (9th Cir. 2026) .......... 6

*Doe v. Grindr Inc.*,
128 F.4th 1148 (9th Cir. 2025) .......... 7

*Durell v. Sharp Healthcare*,
183 Cal. App. 4th 1350 (2010) ........ 5, 10

*Dyroff v. Ultimate Software Grp.*,
934 F.3d 1093 (9th Cir. 2019) ........ 8

*Earth Island Inst. v. Quinn*,
56 F. Supp. 3d 1110 (N.D. Cal. 2014) ........ 22

*In re Enron Corp. Sec.*,
235 F. Supp. 2d 549 (S.D. Tex. 2002) ........ 19

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976) ........ 15, 20

*Force v. Facebook, Inc.*,
934 F.3d 53 (2d Cir. 2019) ........ 6

*In re GlenFed, Inc. Sec. Litig.*,
60 F.3d 591 (9th Cir. 1995) ........ 18

*Gravel v. United States*,
408 U.S. 606 (1972) ........ 12

*Guerrero v. Clinton*,
157 F.3d 1190 (9th Cir. 1998) ........ 11

*Hadley v. Kellogg Sales Co.*,
243 F. Supp. 3d 1074 (N.D. Cal. 2017) ........ 5

*Hicks v. PGA Tour, Inc.*,
165 F. Supp. 3d 898 (N.D. Cal. 2016) ........ 21

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
564 U.S. 135 (2011) ........ 18

*Jeff D. v. Otter*,
643 F.3d 278 (9th Cir. 2011) ........ 12

*Jones v. GNC Franchising, Inc.*,
211 F.3d 495 (9th Cir. 2000) ........ 22

*Kearns v. Ford Motor Co.*,
567 F.3d 1120 (9th Cir. 2009) ........ 4, 15

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ........ 3

*Kimzey v. Yelp!, Inc.*,
836 F.3d 1263 (9th Cir. 2016) ........ 6

*Klayman v. Zuckerberg*,
753 F.3d 1354 (D.C. Cir. 2014) .......... 6, 7

*Krantz v. BT Visual Images*,
89 Cal. App. 4th 164 (2001) .......... 5

*Lanier v. Bats Exch., Inc.*,
838 F.3d 139 (2d Cir. 2016) .......... 17

*Lazar v. Hertz Corp.*,
69 Cal. App. 4th 1494 (1999) .......... 5

*Lipton v. Pathogenesis Corp.*,
284 F.3d 1027 (9th Cir. 2002) .......... 16

*Lorenzo v. SEC*,
587 U.S. 71 (2019) .......... 19

*Mohebbi v. Khazen*,
50 F. Supp. 3d 1234 (N.D. Cal. 2014) .......... 10

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) .......... 12

*Moore v. Brewster*,
96 F.3d 1240 (9th Cir. 1996) .......... 12

*In re Mortg. Elec. Registration Sys., Inc.*,
754 F.3d 772 (9th Cir. 2014) .......... 11

*Motors, Inc. v. Times Mirror Co.*,
102 Cal. App. 3d 735 (1980) .......... 5

*N.Y. Times v. CIA*,
965 F.3d 109 (2d Cir. 2020) .......... 14

*Neo4j, Inc. v. Graph Found., Inc.*,
No. 19-CV-06226, 2020 WL 6700480 (N.D. Cal. Nov. 13, 2020) .......... 18

*Nguyen v. Endologix, Inc.*,
962 F.3d 405 (9th Cir. 2020) .......... 15

*O'Handley v. Padilla*,
579 F. Supp. 3d 1163 (N.D. Cal. 2022) .......... 12

*Park v. Dole Fresh Vegetables, Inc.*,
964 F. Supp. 2d 1088 (N.D. Cal. 2013) .......... 22

*Podolsky v. First Healthcare Corp.*,
50 Cal. App. 4th 632 (1996) .......... 5

*Prager Univ. v. Google LLC*,
85 Cal. App. 5th 1022 (2022)........................................................................................ 7

*Prodanova v. H.C. Wainwright & Co., LLC*,
993 F.3d 1097 (9th Cir. 2021)...................................................................................... 15

*S.F. Residence Club, Inc. v. Amado*,
773 F. Supp. 2d 822 (N.D. Cal. 2011) ......................................................................... 10

*SEC v. Clark*,
915 F.2d 439 (9th Cir. 1990)........................................................................................ 19

*SEC v. Todd*,
642 F.3d 1207 (9th Cir. 2011)................................................................................ 12, 18

*SEC v. Zandford*,
535 U.S. 813 (2002) ............................................................................................... 10, 20

*Selane Prods. v. Cont'l Cas. Co.*,
706 F. Supp. 3d 997 (C.D. Cal. 2020)............................................................................ 5

*In re Silver Lake Grp., LLC Sec. Litig.*,
108 F.4th 1178 (9th Cir. 2024)............................................................................ 4, 15, 16

*In re Social Media Adolescent Addiction/Personal Injury Prods. Liab. Litig.*,
702 F. Supp. 3d 809 (N.D. Cal. 2023) ........................................................................... 7

*Spinner Corp. v. Princeville Dev. Corp.*,
849 F.2d 388 (9th Cir. 1988)..................................................................................... 9, 10

*Sprewell v. Golden State Warriors*,
266 F.3d 979 (9th Cir. 2001)........................................................................................... 4

*Steckman v. Hart Brewing, Inc.*,
143 F.3d 1293 (9th Cir. 1998)......................................................................................... 4

*Stoneridge Inv. Partners, LLC v. Sci.-Atl., Inc.*,
552 U.S. 148 (2008) ............................................................................................... 18, 19

*Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*,
17 Cal. 4th 553 (1998) .................................................................................................. 18

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007) ...................................................................................................... 15

*Trump v. United States*,
603 U.S. 593 (2024) ............................................................................................... *passim*

*United States v. Kaplan*,
836 F.3d 1199 (9th Cir. 2016)...................................................................................... 18

*United States v. O'Hagan*,
521 U.S. 642 (1997) .......... *passim*

*Vess v. Ciba-Geigy Corp. USA*,
317 F.3d 1097 (9th Cir. 2003) .......... 15

*Zeran v. Am. Online, Inc.*,
129 F.3d 327 (4th Cir. 1997) .......... 7

*Zhang v. Superior Court*,
57 Cal. 4th 364 (2013) .......... 18

**Statutes**

15 U.S.C. § 45 *et seq.* .......... 9

15 U.S.C. § 78j(b) .......... *passim*

15 U.S.C. § 78t-1 .......... 10

15 U.S.C. § 78t(e) .......... 18

15 U.S.C. § 78u-4(b)(2) .......... 5, 15

15 U.S.C. § 78u-4(b)(3) .......... 2, 16

18 U.S.C. § 2 .......... 13

18 U.S.C. § 371 .......... 13

28 U.S.C. § 1404 .......... 21, 22

47 U.S.C. § 230(a) .......... 6

47 U.S.C. § 230(c) .......... *passim*

47 U.S.C. § 230(e)(3) .......... 1, 6

47 U.S.C. § 230(f)(2) .......... 6

Cal. Bus. & Prof. Code § 17200 .......... 4, 5

Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat.
737 .......... 2, 4, 15, 18

STOCK Act, Pub. L. No. 112-105, § 9(a), 126 Stat. 291 (2012) .......... *passim*

STOCK Act, Pub. L. No. 112-105, § 9(b), 126 Stat. 291 (2012) .......... 11, 13

**Other Authorities**

17 C.F.R. § 240.10b-5 .......... 10, 13, 14, 19

2 Wayne LaFave, Subst. Crim. L. (3d ed.) .......... 11

CMS Interoperability and Patient Access, 85 Fed. Reg. 25510 (May 1, 2020) .......... 2

Exchange Act Release No. 34-88837, 85 Fed. Reg. 28671 (May 7, 2020) .......... 17

Exchange Act Release No. 34-62960, 75 Fed. Reg. 59310 (Sept. 21, 2010) .......... 17

Fed. R. Civ. P. 9(b) .......... 4, 15, 16

Fed. R. Civ. P. 12(b)(6) .......... 4

Gerben Bakker, *The Terminal Revolution: Reuters and Bloomberg as Global Providers of Financial and Economic News, 1960-2020* (Lond. Sch. of Econ. & Pol. Sci., Working Paper No. 384, 2025) .......... 16

Regulation NMS, Exchange Act Release No. 34-51808, 70 Fed. Reg. 37496 (June 29, 2005) .......... 17

U.S. Const. amend. I .......... 12

## CIVIL L.R. 7-4(a)(3) STATEMENT OF ISSUES TO BE DECIDED

This motion raises the following issues:

1. Whether Plaintiff's Complaint should be dismissed under Federal Rules of Civil Procedure 12(b)(6) and 9(b) and under the Private Securities Litigation Reform Act of 1995 ("PSLRA") for failing to adequately plead a primary or derivative violation of Section 9(a) of the STOCK Act, Section 10(b) of the Securities Exchange Act as well as the rules promulgated thereunder, and California's Unfair Competition Law.

2. Whether the case should be transferred to the U.S. District Court for the Middle District of Florida under 28 U.S.C. § 1404.

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

This baseless lawsuit fails for four independent reasons. ***First***, Section 230 of the Communications Decency Act bars the entire suit. "[N]o liability may be imposed" on online services for publishing their users' speech. Here, Plaintiff's state-law claim challenging TMTG's publication of users' speech is barred by federal preemption. 47 U.S.C. § 230(c)(1), (e)(3). Each of Plaintiff's flawed theories challenges the speed with which TMTG's online services, Truth Social and Truth API, publish President Donald J. Trump's posts. Congress has barred States from imposing liability for those publishing decisions. As the Ninth Circuit has made clear, Plaintiff cannot attempt to sidestep Section 230 by mischaracterizing Truth Social's and Truth API's publishing decisions. *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101–03 (9th Cir. 2009) ("[A] plaintiff cannot sue someone for publishing third-party content simply by changing the name of the theory[.]").

***Second***, Plaintiff's Unfair Competition Law ("UCL")—the only stated claim—does not apply to securities transactions. *See Bowen v. Ziasun Techs., Inc.*, 116 Cal. App. 4th 777, 786–88 (2004). As detailed below, all three of Plaintiff's failed UCL theories rest upon wholly baseless allegations of securities fraud. Specifically, Plaintiff wrongly claims that a fifty-millisecond difference in the delivery of President Trump's social media posts on Truth API versus Truth Social somehow turns such posts into material nonpublic information unlawfully shared with users of Truth API in violation of securities laws. Compl. ¶¶ 22, 31. California law provides no cause of action for such frivolous claims.

***Third***, Plaintiff's (false) allegation that TMTG aided and abetted a violation of the federal STOCK Act by the President fails as a matter of law. Section 9(a)(1) of the STOCK Act, Pub. L. No. 112-105, § 9(a), 126 Stat. 291, 297 (2012) ("STOCK Act"), merely directs the Office of Government Ethics ("OGE") to issue interpretive guidance for federal officials. It imposes no obligation on the President and cannot support a cause of action against anyone for his alleged violation of this law. Moreover, under the Supreme Court's decision in *Trump v. United States*, President Trump is plainly immune from liability related to his public statements to the American

people, including Truth Social posts, regarding his Administration's policies and decisions. *See* 603 U.S. 593, 614–15, 628–30 (2024). Unable to allege any underlying violation against President Trump, Plaintiff cannot plead that TMTG engaged in aiding and abetting a non-violation.

***Fourth***, a fifty-millisecond difference in the delivery of the President's posts on Truth API versus Truth Social cannot constitute securities fraud. Misappropriation requires a deceptive breach of confidence in connection with securities trading. *See United States v. O'Hagan*, 521 U.S. 642, 652–55 (1997). The Complaint identifies no confidential tip, no advance copy, and no agreement to deceive. And it cannot plead scienter with the specificity required by the PSLRA. Indeed, five of the President's supposedly "market-moving posts" cited by Plaintiff predate the existence of Truth API. Compl. ¶ 21. Plaintiff's aiding and abetting, conspiracy, and scheme liability claims fail for the same reason.

The Court should dismiss the Complaint with prejudice and stay all discovery while this motion is pending. *See* 15 U.S.C. § 78u-4(b)(3)(A), (B). If any part survives, and none should, the Court should transfer this case to the Middle District of Florida.

## II. BACKGROUND

### A. Truth Social and Truth API

TMTG operates Truth Social, a social media platform with millions of users. President Trump launched Truth Social after traditional social media platforms banned him. *See* Compl. ¶ 15. Truth Social users create posts called Truths and publish them on the platform. *See id.* ¶¶ 21, 23. Truth API delivers posts from Truth Social's most popular accounts, including the President's, to subscribers, approximately fifty milliseconds faster than to the platform's other users. *See id.* ¶¶ 22, 31. By way of background, an application programming interface ("API") allows a developer to provide tools that a third party can use to interact with the developer's content without knowing its internal workings. *See* 85 Fed. Reg. 25510, 25515 (May 1, 2020).

In July 2026, TMTG issued a press release announcing that it would launch Truth API. *See* Compl. ¶¶ 22, 37 & n.30. This announcement disclosed the service's speed and its commercial purpose. *Id.* ¶¶ 37, 60. The Complaint describes Truth API as a "paid data service"

that delivers posts from Truth Social's ten most influential accounts "to paying subscribers faster than the same information is delivered to the platform's other users." *Id.* ¶ 22. The Complaint alleges that the difference is only a "50 millisecond advantage" in machine-readable delivery sent to "algorithmic trading platform[s]." *Id.* ¶ 31. The covered accounts include the President and other government officials. *Id.* ¶¶ 22–23.

Plaintiff relies on a CNBC interview with Kevin McGurn, TMTG's interim CEO. McGurn explained that the fifty-millisecond difference reflects "internet delivery" because "all posts go out in real time. As soon as the [P]resident posts or any of our other creators post, it is public information. It goes out on the internet." Request for Judicial Notice ("RJN"), Ex. A to the Declaration of Amanda L. Morgan. He added that "if it's machine readable, machines are faster than people. That's why that little latency occurs." *Id.* As detailed in Defendant's Request for Judicial Notice, the Court should consider the full interview because the Complaint incorporates it by reference. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018).

**B. Plaintiff's Mischaracterization of Truth API**

Plaintiff wrongly tries to miscast Truth API as involving the improper sale of nonpublic information. Common sense and the implausible allegations in the Complaint fatally undermine this conclusory theory. Specifically, the Complaint misleadingly alleges that Truth API gives subscribers "priority access to President Donald J. Trump's . . . posts on Truth Social," and that Truth API facilitates the distribution of "nonpublic" content. Compl. ¶¶ 1, 21. That is wrong. Far from sharing nonpublic information, Truth API distributes already-posted, public information to subscribers by allowing such subscribers a direct connection to Truth Social servers.

The Complaint also wrongly alleges that Truth API improperly benefits the President himself because he holds shares of TMTG through a trust of which he is the beneficiary. *Id.* ¶ 17. Critically, Plaintiff fails to allege that the President controls TMTG beyond what any ordinary investor would exercise. To support its false claim that the President is "not a mere passive investor," Plaintiff offers only *one* remark by McGurn concerning the President posting on Truth Social, a remark that shows no control at all: that the President is "the one at the end of the phone."

*Id.* ¶ 18. The Complaint pleads no facts showing that the President designed, approved, priced, or ever operated Truth API—because he did none of that. Plaintiff alleges only that the President continues to post knowing that Truth API exists. *See id.* ¶ 25.

### C. Plaintiff's UCL Claim and Requested Relief

On September 21, 2026, the City Attorney of San Francisco filed this action in San Francisco Superior Court on behalf of the People of California. On November 18, 2026, TMTG timely removed the action to this Court. Notice of Removal, Dkt. 1. The Complaint asserts a single, improper claim under the unlawful and unfair prongs of California's UCL, Cal. Bus. & Prof. Code § 17200. Compl. ¶¶ 44–66.

## III. LEGAL STANDARDS

***Fed. R. Civ. P. 12(b)(6).*** To survive this motion to dismiss under Rule 12(b)(6), the Complaint must "state a claim to relief that is plausible on its face," supported by factual allegations sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). The Complaint must provide "more than labels and conclusions." *Id.* Neither "a formulaic recitation of the elements of a cause of action" nor "'naked assertion[s]' devoid of 'further factual enhancement'" is sufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557). This Court must accept well-pleaded factual allegations as true, but "unwarranted deductions of fact, . . . unreasonable inferences" or "conclusory allegations . . . contradicted by documents referred to in the complaint" get no deference. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001), *amended on other grounds by* 275 F.3d 1187 (9th Cir. 2001); *see Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295–96 (9th Cir. 1998).

***Fed. R. Civ. P. 9(b) and the PSLRA.*** "Insider trading actions must meet the higher, exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the PSLRA." *In re Silver Lake Grp., LLC Sec. Litig.*, 108 F.4th 1178, 1191 (9th Cir. 2024) (quotation marks and ellipsis omitted). Rule 9(b) requires particular allegations, including the "who, what, when, where, and how of the misconduct charged." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (quotation marks omitted). Plaintiffs must "set forth *more* than the neutral facts necessary to

identify the transaction." *Id.* (quotation marks omitted). Under the PSLRA, Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).

***UCL Claims.*** The UCL, Cal. Bus. & Prof. Code § 17200 *et seq.*, proscribes "three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent." *Berryman v. Merit Prop. Mgmt., Inc.*, 152 Cal. App. 4th 1544, 1554 (2007) (quoting *Podolsky v. First Healthcare Corp.*, 50 Cal. App. 4th 632, 647 (1996)). In this case, Plaintiff's claim raises only unlawful and unfair theories:

The UCL's unlawful prong borrows violations of other laws to make them independently actionable. *Berryman*, 152 Cal. App. 4th at 1554 (quoting *Lazar v. Hertz Corp.*, 69 Cal. App. 4th 1494, 1505 (1999)). To state an unlawful prong claim, Plaintiff must plausibly plead a violation of another predicate law. *See, e.g.*, *id.*; *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1360–61 (2010). The "UCL claims 'stand or fall depending on the fate of the antecedent substantive causes of action.'" *Selane Prods. v. Cont'l Cas. Co.*, 706 F. Supp. 3d 997, 1006 (C.D. Cal. 2020) (quoting *Krantz v. BT Visual Images*, 89 Cal. App. 4th 164, 178 (2001)).

To state a claim under the unfair prong, Plaintiff must adequately plead that "the gravity of the harm to the alleged victim" outweighs "the utility of the defendant's conduct." *Berryman*, 152 Cal. App. 4th at 1555 (quoting *Motors, Inc. v. Times Mirror Co.*, 102 Cal. App. 3d 735, 740 (1980)). Where Plaintiff's unlawful and unfair theories target the same business practices, as they do here, the "unfair prong of the UCL cannot survive" if the unlawful claim is dismissed. *Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1104–05 (N.D. Cal. 2017).

## IV. ARGUMENT

### A. By Its Terms, Section 230 Expressly Preempts Plaintiff's Claims.

Section 230 of the Communications Decency Act bars this action because TMTG is an interactive computer service provider, and Plaintiff's flawed theories impermissibly target TMTG's publishing decisions and the mechanics of publication. *See* 47 U.S.C. § 230.

Section 230 states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content

provider." 47 U.S.C. § 230(c)(1). That immunity applies if (1) the defendant is a "provider . . . of an interactive computer service," and (2) the claim seeks to hold the defendant liable as a "publisher or speaker" of (3) content provided by someone else. *Id.*; *see Doe 1 v. Meta Platforms, Inc.*, 174 F.4th 1159, 1167 (9th Cir. 2026) (affirming dismissal with prejudice on a motion to dismiss). The statute expressly preempts state-law claims inconsistent with its terms: "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3); *see Force v. Facebook, Inc.*, 934 F.3d 53, 64 (2d Cir. 2019) ("[T]he Circuits are in general agreement that the text of Section 230(c)(1) should be construed broadly in favor of immunity.").

As the Ninth Circuit has recognized, Congress enacted Section 230 to "promote the free exchange of information and ideas over the Internet." *Barnes*, 570 F.3d at 1099–1100 (quotation marks omitted); *see also Kimzey v. Yelp!, Inc.*, 836 F.3d 1263, 1266 (9th Cir. 2016) (quoting 47 U.S.C. § 230(a)(3)–(4)) (affirming dismissal with prejudice on a motion to dismiss). In applying Section 230 to a claim, "what matters is not the name of the cause of action," but "whether the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another." *Barnes*, 570 F.3d at 1101–02; *see also Meta Platforms*, 174 F.4th at 1168. Plaintiff may not engage in "creative pleading" to "advance the same basic argument that the statute plainly bars." *Kimzey*, 836 F.3d at 1265–66.

Here, the straightforward application of Section 230(c)'s three elements shows that Plaintiff's UCL claim is preempted because it seeks to impose state-law liability on TMTG for immunized conduct.

**1. TMTG Provides Interactive Computer Services.**

Truth Social is exactly the kind of platform that Congress set out to protect. Section 230 immunity applies to providers of "interactive computer service[s]," which courts have uniformly held include social media companies such as Truth Social. *See, e.g.*, *Klayman v. Zuckerberg*, 753 F.3d 1354, 1357 (D.C. Cir. 2014) (Facebook). Truth Social qualifies as an interactive computer service because it provides information to "multiple users" by giving them "computer access . . . to a computer server," namely the servers that host Truth Social's social media website. 47 U.S.C.

§ 230(f)(2). When Truth Social users browse the site and review other users' posts, "they do so by gaining access to information stored on [Truth Social] servers." *Klayman*, 753 F.3d at 1357.

**2. Plaintiff's Claims Treat TMTG as a Publisher.**

Section 230(c)(1) "precludes liability" where "the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher or speaker.'" *Barnes*, 570 F.3d at 1102. Courts are guided by "common sense and [the] common definition of what a publisher does." *Id.* Claims targeting a defendant's "reviewing, editing, and deciding" whether to "publish, withdraw, *postpone* or alter content" treat it as a publisher. *Id.* (emphasis added) (quoting *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997)).

Here, all of Plaintiff's failed theories rest on TMTG's alleged decision to give Truth API subscribers access to President Trump's posts fifty milliseconds faster than on Truth Social. The Complaint thus treats TMTG as a publisher, and no amount of artful pleading alters that. Plaintiff (falsely) alleges that: (i) President Trump violates Section 9(a) of the STOCK Act by publishing nonpublic information, (ii) TMTG assists by giving "early access to market-moving information," Compl. ¶¶ 32, 50–53, (iii) TMTG violates insider trading laws by scheming to provide "material nonpublic information" to unnamed "investors who pay for Truth API," *id.* ¶¶ 55–56, and (iv) Truth API creates a market "information asymmetry" by transmitting the President's posts fifty milliseconds faster than on Truth Social, *id.* ¶¶ 59–63.

Plaintiff's untrue claims are barred because choosing when and to whom to deliver content is at the heart of a publisher's traditional editorial function. *See Zeran*, 129 F.3d at 330. Publishers may send advance copies to reviewers and a subset of readers; newspapers push headlines to email subscribers first; and wire services deliver breaking news to subscribing outlets before the general public. By seeking to hold TMTG liable for allegedly delivering third-party content to some of its subscribers first—by fifty milliseconds, Compl. ¶ 31—Plaintiff is treating TMTG as a publisher. *See Doe v. Grindr Inc.*, 128 F.4th 1148, 1151 (9th Cir. 2025); *In re Social Media Adolescent Addiction/Personal Injury Prods. Liab. Litig.*, 702 F. Supp. 3d 809, 833 (N.D. Cal. 2023) (algorithm that determines "whether, when, and to whom to publish third-party

content" is immune); *Prager Univ. v. Google LLC*, 85 Cal. App. 5th 1022, 1033 (2022) ("Whether styled as a violation of . . . the UCL, or [otherwise], the conduct [plaintiff] alleges is injurious consists of defendants' decisions regarding the audience to which videos would be published[.]").

**3. Plaintiff's Claims Depend on Content Provided by Others.**

Every word Plaintiff complains about was written by someone other than TMTG. *See, e.g.*, Compl. ¶¶ 1–4, 21–22, 31–32, 50–64.[2] The Complaint attempts to impose liability on TMTG by treating it as the publisher of third-party user content: Plaintiff alleges that TMTG aids and abets an alleged (nonexistent) securities violation by "*creating a literal platform*" for the President's posts. *Id.* ¶¶ 40, 50–53 (emphasis added). Because TMTG is simply a publisher of the President's posts, Section 230 bars all of Plaintiff's state-law claims. *See*, *e.g.*, *Dyroff v. Ultimate Software Grp.*, 934 F.3d 1093, 1098–99 (9th Cir. 2019) (affirming dismissal of claims against service provider where third parties created the relevant content); *Barnes*, 570 F.3d at 1101 (explaining that Section 230 precludes liability when the alleged violation "derives from the defendant's status or conduct as a 'publisher or speaker'" (quoting 47 U.S.C. § 230(c)(1))).

The Court should dismiss the entire Complaint with prejudice on this ground alone. Congress enacted Section 230 to protect an internet that encourages new technologies. Plaintiff's baseless and harassing claim is exactly what Congress barred.

**B. Plaintiff Cannot State a Claim Under the UCL.**

Plaintiff's single UCL count rests on three legally baseless theories. ***First***, Plaintiff alleges that the President violates Section 9(a) of the STOCK Act by using "nonpublic information . . . as a means for making a private profit." Compl. ¶¶ 40, 50–51. Plaintiff alleges that TMTG aids and abets that nonexistent violation by "creating a literal platform" for the President's posts. *Id.* ¶¶ 40, 50–53.

***Second***, Plaintiff wrongly alleges that TMTG violates federal insider trading law by "participat[ing] in a scheme" to provide "material nonpublic information" to unspecified

---

[2] Plaintiff's entire theory of liability revolves around threadbare allegations of harm due to the President's posts. *See* Compl. ¶¶ 30, 55–56, 61. Plaintiff does not allege any facts showing that other accounts purportedly "covered by Truth API" have posted anything market moving.

"investors who pay for Truth API." *Id.* ¶¶ 55–56. Plaintiff further falsely alleges that TMTG "participate[s] in a scheme" to misappropriate information that "it knows or should know is the result of a breach of the duty of trust and confidence to the government and/or the American people." *Id.* ¶ 56. To try to plead scienter, which does not exist, the Complaint includes conclusory assertions that TMTG acts with "actual knowledge" and operates Truth API "intentionally." *Id.* ¶ 53.

***Third***, Plaintiff's unfair theory relies on the same conduct. *Id.* ¶ 58. Plaintiff falsely alleges that Truth API creates an "information asymmetry in the markets" that harms "anyone without early access to the nonpublic information." *Id.* ¶¶ 59–63. It further wrongly alleges that Truth API pushes firms to "risk potential legal exposure," *i.e.*, engage in insider trading, to obtain "early access to market-moving information." *Id.* ¶ 62.

**1. The UCL, a Little FTC Act, Does Not Reach Securities Transactions.**

A violation of securities laws, which does not exist here in the first place, cannot serve as the predicate for a UCL claim. All three of Plaintiff's flawed UCL theories rest on allegations that President Trump and TMTG violated the federal securities laws. Because the UCL does not apply to securities transactions, Plaintiff's claims must be dismissed as a matter of law.

The UCL is "California's 'little FTC Act,' which mirrors its federal counterpart, the Federal Trade Commission (FTC) Act." *Bowen*, 116 Cal. App. 4th at 786 (citing 15 U.S.C. § 45 *et seq.*). Consumer protection acts modeled after the FTC Act do not reach securities transactions. *Id.* at 786–88. In *Bowen*, the plaintiff alleged that the defendant unlawfully and unfairly sold stock of publicly traded companies "by making misstatements and omissions of material fact." *Id.* at 779. The defendant filed a demurrer, arguing that the UCL claims "were without merit because that statute did not apply to securities transactions." *Id.* at 781. The Court of Appeal affirmed the trial court's dismissal, emphasizing that federal courts applying California law had reached the same conclusion, as had many other jurisdictions analyzing their own consumer protection laws. *Id.* at 787 (collecting cases). The Court of Appeal found that "[t]he FTC has never undertaken to adjudicate deceptive conduct in the sale and purchase of securities, presumably because such transactions fall under the [SEC's] comprehensive regulatory

umbrella." *Id.* at 788 (quoting *Spinner Corp. v. Princeville Dev. Corp.*, 849 F.2d 388, 392 n.4 (9th Cir. 1988)).

Courts continue to bar plaintiffs from using securities transactions as a UCL predicate. *See, e.g.*, *Adams v. Small*, No. D054402, 2009 WL 3808295, at *15 (Cal. Ct. App. Nov. 16, 2009); *see also Spinner*, 849 F.2d at 392–93 (finding Hawaii consumer protection law does not reach securities transactions). Where the UCL claim turns on securities transactions, *Bowen* applies, and the claim must be dismissed.

Here, Plaintiff's UCL claim is grounded entirely in the securities laws. Plaintiff's unlawful theories falsely allege violations of insider trading prohibitions and their purported applicability to the Executive Branch under the STOCK Act. *See* Compl. ¶¶ 41, 50–53, 55–56. Its unfair claim merely labels the same conduct "unfair," *see, e.g.*, *id.* ¶¶ 58 ("Trump Media's actions are *also* unfair business practices under the UCL." (emphasis added)), 59–63. Insider trading sits in the heartland of securities transactions law. *See O'Hagan*, 521 U.S. at 658; *SEC v. Zandford*, 535 U.S. 813, 825 (2002). Insider trading requires (1) a transaction in securities (2) in reliance on inside information (3) in violation of a cognizable legal duty. *See* 15 U.S.C. §§ 78j(b), 78t-1; 17 C.F.R. § 240.10b-5; *O'Hagan*, 521 U.S. at 652. Therefore, Plaintiff's claim "unavoidably focuses on the purchase of securities" and cannot proceed under the UCL. *S.F. Residence Club, Inc. v. Amado*, 773 F. Supp. 2d 822, 834 (N.D. Cal. 2011); *Mohebbi v. Khazen*, 50 F. Supp. 3d 1234, 1259 (N.D. Cal. 2014) (dismissing with prejudice UCL claims arising out of securities transactions).

Because Plaintiff's single UCL claim turns entirely on securities transactions, and is thus barred here, this Court should dismiss it with prejudice.

**2. Plaintiff Fails to Plausibly Plead a Violation of the STOCK Act.**

Even if a securities law violation could serve as a predicate for the UCL (it cannot), Plaintiff fails to allege any violation of the UCL. To try to allege a violation of the UCL, Plaintiff wrongly claims that President Trump violated the STOCK Act by using "nonpublic information" "as a means for making a private profit." Compl. ¶¶ 40, 50–51. Because Section 9(a) of the STOCK Act does not create any cause of action, it cannot serve as a predicate violation for a UCL

claim. *See Durell*, 183 Cal. App. 4th at 1360–61.[3]

The STOCK Act "amends securities and commodities laws to make clear that Members of Congress and their staff are not . . . exempt" from laws prohibiting insider trading. S. Rep. No. 112-244, at 1 (2012). Section 9(b) does the same for Article II and Article III employees. Section 9(a) directs the OGE (for Executive Branch employees) and the Judicial Conference (for judicial officers and judicial employees) to issue ***guidance*** "clarify[ing] that no executive branch employee may use nonpublic information . . . as a means for making a private profit." Pub. L. No. 112-105, § 9(a), 126 Stat. 291, 297 (2012). Section 9(a) does not prohibit any particular conduct.

A congressional command to OGE to issue guidance is not a command to the President. Section 9(a) of the STOCK Act imposes no obligation on the President. It merely directs OGE to issue guidance. *See generally* 2 Wayne LaFave, Subst. Crim. L. § 12.4(c)(4) (3d ed.) ("Crimes are often defined in such a way that they may be directly committed only by a person who . . . occupies a particular position."); *cf. Guerrero v. Clinton*, 157 F.3d 1190, 1191 (9th Cir. 1998) (ordering dismissal of lawsuit claiming the Office of Insular Affairs failed to issue a report mandated by Congress). Because the President cannot be found to violate the STOCK Act, TMTG cannot be liable for aiding and abetting such a nonexistent violation. *See In re Mortg. Elec. Registration Sys., Inc.*, 754 F.3d 772, 786 (9th Cir. 2014) ("Aiding-and-abetting liability depends on the existence of an underlying tort.").

Plaintiff's aiding-and-abetting theory also fails for lack of an underlying violation. President Trump is plainly entitled to official acts immunity for the posts that Plaintiff wrongly alleges are "market-moving." In those posts, President Trump announced his Administration's policies and decisions to the American people, an exercise of presidential authority that is at the core of his official responsibilities. *Trump*, 603 U.S. at 614–15, 628–30.

Plaintiff knows that the President is immune. That is why it has improperly substituted

---

[3] Unlike Section 9(a), which is central to the claims, Section 9(b) is mentioned only twice in the Complaint. Section 9(b) merely clarifies that existing securities duties apply to the Executive Branch. 158 Cong. Rec. S1977, S1978 (2012) (statement of Sen. Collins).

TMTG, a publisher, for the same immunized conduct—to try to end-run the President's official acts immunity. But where an exercise of presidential power is protected, that act cannot supply a predicate offense for aiding-and-abetting liability against a third party. *Id.* at 608–09; *see also Gravel v. United States*, 408 U.S. 606, 617–18 (1972) (extending Speech or Debate Clause immunity to legislative aides without which the Members' own protection is "diminished and frustrated"); *Jeff D. v. Otter*, 643 F.3d 278, 289–90 (9th Cir. 2011) (extending legislator immunity to a budget analyst); *Moore v. Brewster*, 96 F.3d 1240, 1244–45 (9th Cir. 1996) (extending judicial immunity to a law clerk).

In any event, Plaintiff identifies no confidential tip, no arrangement to trade on advance information, and no conduct apart from a fifty-millisecond difference in the timing of the publication of the President's public announcements on Truth API versus Truth Social that could supply the alleged primary violation. No such violation exists. Plaintiff instead improperly asks the Court to unlawfully transform the President's exercise of his official authority into a federal offense, and then to wrongly hold TMTG liable for publishing his words. Because there is no underlying offense here, there is nothing for TMTG to have aided or abetted. *SEC v. Todd*, 642 F.3d 1207, 1225 (9th Cir. 2011). That is yet another reason to dismiss Plaintiff's first unlawful theory with prejudice.

TMTG's editorial choices are also protected by the First Amendment. In *Moody v. NetChoice, LLC*, the Supreme Court extended the First Amendment's sweeping protections to a company "exercising editorial discretion in the selection and presentation of content." 603 U.S. 707, 731 (2024) (quotation marks and brackets omitted). Specifically, a publisher is free to decide which content "will be included in or excluded from" its platform, and how to then "organiz[e] and present[] the included items." *Id.* Truth API is, at bottom, a function of TMTG's editorial freedom that is entitled to First Amendment protection. *See O'Handley v. Padilla*, 579 F. Supp. 3d 1163, 1186–87 (N.D. Cal. 2022) ("Twitter makes decisions about what content to include, exclude, moderate, filter, label, restrict, or promote, and those decisions are protected by the First Amendment."), *aff'd sub nom. O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023). Granting Plaintiff's requested relief would therefore violate the First Amendment, as well.

Plaintiff's claims must be dismissed with prejudice.

### 3. Plaintiff Fails to Plausibly Plead the President or TMTG Violated Insider Trading Laws.

Fifty milliseconds does not turn the President's public announcements into insider trading. Plaintiff wrongly alleges that TMTG "participate[s] in a scheme" to misappropriate "material nonpublic information," resulting from some breach of the duty of trust and confidence to the government or the American people in violation of Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), Rule 10b-5, 17 C.F.R. § 240.10b-5, Section 9(b) of the STOCK Act, and federal aiding and abetting and conspiracy laws, 18 U.S.C. §§ 2, 371. Compl. ¶¶ 55–56. Plaintiff falsely contends that TMTG launched Truth API to monetize the President's "market moving" posts, and that President Trump posts on Truth Social "with knowledge that [TMTG] is using that nonpublic information" for its benefit. *Id.* ¶ 25. Plaintiff's allegations of insider trading fail for at least three reasons.

***First***, Plaintiff cannot plead a primary violation by President Trump. The President posting information about his decisions and other announcements to the public does not constitute "misappropriation" of information belonging to the U.S. Government. The Complaint pleads no particularized facts showing that President Trump intended to deceive anyone, nor can it. To the contrary, the Complaint demonstrates that the President continued to do what he did before Truth API launched—post public announcements of his decisions and other matters. Plaintiff's pursuit of civil liability is especially futile under the facts of this case because, as explained below, the SEC permits companies to sell "colocation" services, which provide traders faster access to market information. Leveraging latency is a ubiquitous, lawful feature of modern securities markets.

***Second***, Plaintiff's flawed theories against TMTG rely on a non-violation by President Trump of insider trading laws. Because the President does not commit insider trading by posting publicly about his decisions and other matters, there can be no primary violation, no scheme, no conspiracy, and no aiding and abetting liability.

***Third***, Plaintiff's "misappropriation" theory requires breach of a duty of trust and

confidence, but Plaintiff identifies neither a cognizable duty nor a purported breach applicable to TMTG. Critically, like President Trump, TMTG has deceived no one.

Because Plaintiff has not pleaded (and cannot plead) insider trading, that theory cannot supply the predicate unlawful act the UCL requires, and Plaintiff's second theory of unlawfulness should be dismissed with prejudice.

***(a) Plaintiff Fails to Plead a Primary Violation by President Trump.***

Section 10(b) prohibits any "deceptive device or contrivance" "in connection with the purchase or sale of any security" "in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). The SEC's Rule 10b-5 makes it unlawful "[t]o employ any device, scheme, or artifice to defraud" or "[t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person" "in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(a), (c). Insider trading under Section 10(b) takes two forms. In the "classical" theory, the corporate insider misuses nonpublic information to gain an unfair advantage in the market. *O'Hagan*, 521 U.S. at 651–52. Under the "misappropriation" theory, which Plaintiff seems to allege here, *see* Compl. ¶¶ 41, 56, a corporate outsider receives nonpublic information and betrays "the source of the information" by using it to trade, "defraud[ing] the principal of the exclusive use of that information." *O'Hagan*, 521 U.S. at 652–53. "Because the deception essential to the misappropriation theory involves feigning fidelity to the information's source, if the fiduciary discloses to the source that he plans to trade on the information, there is no 'deceptive device' and thus no § 10(b) violation." *Id.* at 655.

Plaintiff falsely alleges that President Trump misappropriates nonpublic information and publishes it knowing "that [TMTG] is using that nonpublic information" for its benefit. Compl. ¶ 25. That claim fails.

***First***, providing information to the public, including via a social media platform, is not "misappropriation." To the contrary, "[t]he President possesses extraordinary power to speak to his fellow citizens and on their behalf." *Trump*, 603 U.S. at 598 (quotation marks omitted). And, by definition, his statements, once shared publicly, are no longer "nonpublic." *See N.Y. Times v. CIA*, 965 F.3d 109, 122 (2d Cir. 2020).

Recognizing the absurdity of its theory, Plaintiff inaptly alleges, without a single supporting fact, that President Trump "knows" about Truth API and "has continued posting on Truth Social" to reap its benefits for himself. Compl. ¶ 25. That theory is baseless. TMTG, not President Trump, launched Truth API, and the President is not an officer or director of the company, nor does he have any other management role. The Complaint pleads no facts suggesting that the President had anything to do with the creation of Truth API, or that he posts on Truth Social with intent to deceive or defraud anyone. In fact, President Trump has been consistent in posting announcements on Truth Social for years, long before Truth API was even under consideration.

To demonstrate some level of intent to deceive or defraud, Plaintiff must satisfy the dual requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA. *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1106 (9th Cir. 2021); *Kearns*, 567 F.3d at 1124–25; *Silver Lake*, 108 F.4th at 1191; *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103–04 (9th Cir. 2003). It wholly fails to do so.

Rule 9(b) requires "the who, what, when, where, and how of the misconduct charged." *Prodanova*, 993 F.3d at 1106. And the PSLRA demands that Plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Silver Lake*, 108 F.4th at 1191 (quoting 15 U.S.C. § 78u-4(b)(2)). Here, Plaintiff must allege an "intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976); *accord Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020) (to plead scienter, a plaintiff must "allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness"). Crucially, it is not enough that "a reasonable factfinder plausibly could infer from the complaint's allegations the requisite state of mind." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007). Rather, the factfinder must first consider "any opposing inference one could draw from the facts alleged," and then decide whether scienter is "at least as compelling as [that] opposing inference." *Id.* at 324. If any opposing inference is more compelling, then a plaintiff has failed to meet its burden. *Id.* "The 'strong inference' standard 'present[s] no small hurdle for the securities fraud plaintiff.'" *Prodanova*, 993 F.3d at

1106.

The creation of Truth API changed nothing about the President's behavior. Indeed, five of the seven supposedly "market-moving posts" highlighted in the Complaint were posted ***before*** Truth API launched. *See* Compl. ¶ 21 (alleging that, before Truth API launched, the President posted government information that "influenced financial" markets, including about the Iran war, Japanese steel, and tariffs on China). After Truth API launched, the President continued to do what he did before: post publicly on Truth Social. No well-pleaded fact in the Complaint suggests that President Trump knows Truth API exists, much less that he posts on Truth Social to somehow exploit the fifty-millisecond delivery difference between Truth API and Truth Social. That is an absurd and baseless assertion. Under binding Ninth Circuit precedent, pleading "mere motive and opportunity" is not sufficient. *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035 (9th Cir. 2002) (quotation marks omitted).

Moreover, under Rule 9(b), Plaintiff fails to plead the required how, when, and where of the President's supposed misconduct. *See Silver Lake*, 108 F.4th at 1191 (requiring dates and times, places, and benefits). Because the Complaint fails to plausibly allege scienter and particularized facts, it must be dismissed with prejudice, and all discovery must be stayed. *See* 15 U.S.C. § 78u-4(b)(3)(A), (B); Fed. R. Civ. P. 9(b).

***Second***, a platform does not violate insider trading laws by giving subscribers faster access to market information. Similar products are ubiquitous: subscribers to the *Wall Street Journal* may discover a bankruptcy sooner than the general public, subscribers to X's "Firehouse API" receive posts, including the President's, more quickly,[4] and the Bloomberg terminal boasts of its ability to provide financial data in "microseconds."[5] *See generally* Gerben Bakker, *The Terminal Revolution: Reuters and Bloomberg as Global Providers of Financial and Economic News, 1960-*

---

[4] *Compliance Firehouse API*, X, https://docs.x.com/x-api/enterprise-gnip-2.0/fundamentals/firehouse (last visited Nov. 25, 2026). This webpage is provided for the Court's awareness rather than for use at the motion to dismiss stage.

[5] *How Bloomberg Handles a Massive Wave of Real-Time Market Data in Microseconds*, Bloomberg (Mar. 4, 2022), https://www.bloomberg.com/company/stories/how-bloomberg-handles-a-massive-wave-of-real-time-market-data-in-microseconds/. This article is provided for the Court's awareness rather than for use at the motion to dismiss stage.

*2020*, at 9–10, 20 (Lond. Sch. of Econ. & Pol. Sci., Working Paper No. 384, 2025) (describing the speed introduced by trading terminals and listing terminal price at tens of thousands of dollars).

Indeed, "neither the Congress nor the Commission ever has adopted a parity-of-information rule," and Section 10(b) imposes no "general duty between all participants in market transactions to forgo actions based on material, nonpublic information." *Chiarella v. United States*, 445 U.S. 222, 233 (1980). The SEC therefore recognizes that disparities in the timing of delivery are a routine aspect of the industry. In examining the highly analogous situation of traders who obtain a speed advantage by paying to connect directly to market centers, the SEC determined that they need not "synchronize the delivery of [their] data to end-users" with delivery through the network processor. Regulation NMS, Exchange Act Release No. 34-51808, 70 Fed. Reg. 37496, 37567 (June 29, 2005). The SEC has also approved paid "colocation" and data services that give subscribers reduced latency in receiving market data. *See* Exchange Act Release No. 34-62960, 75 Fed. Reg. 59310, 59311 (Sept. 21, 2010); Exchange Act Release No. 34-88837, 85 Fed. Reg. 28671, 28672–75 (May 7, 2020); *Lanier v. Bats Exch., Inc.*, 838 F.3d 139, 154 (2d Cir. 2016) ("[T]he SEC has approved the Exchanges' use of [proprietary] feeds and co-location services."). Those agency approvals reflect the settled principle that modern markets treat contractual access to a latency advantage in receiving publicly available information as permissible, not fraudulent.

Thus, even Plaintiff's barebones (and legally insufficient) allegations merely amount to a provider granting Truth API subscribers a fifty-millisecond trading advantage. That is not insider trading.

***(b) Plaintiff Cannot Plead a Derivative Violation by TMTG.***

Plaintiff's derivative claims against TMTG also fail. A civil plaintiff has no standing to bring a claim for aiding and abetting or conspiring to violate the securities laws. Even if it did, with no primary violation, Plaintiff's derivative theories collapse. Because Plaintiff fails to state a claim against President Trump, its derivative claims against TMTG must be dismissed as a matter of law.

***First***, a private plaintiff may not assert an aiding and abetting or conspiracy claim under Section 10(b). *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 143 (2011). After the Supreme Court barred derivative suits in *Central Bank, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164 (1994), there were "calls for Congress to create an express cause of action for aiding and abetting within the Securities Exchange Act." *Stoneridge Inv. Partners, LLC v. Sci.-Atl., Inc.*, 552 U.S. 148, 158 (2008). Congress refused. *Id.* Instead, with an eye toward curbing the scourge of "abusive" securities litigation, Congress passed the PSLRA and explicitly granted "authority" only to the SEC to "prosecute aiding and abetting." *See id.*; Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, §§ 101, 104, 109 Stat. 737, 737, 757; 15 U.S.C. § 78t(e). The Ninth Circuit has extended that principle to conspiracy claims. *In re GlenFed, Inc. Sec. Litig.*, 60 F.3d 591, 592 (9th Cir. 1995).

The UCL cannot save Plaintiff's failed claims. The Supreme Court of California has held that "the UCL cannot be used to state a cause of action the gist of which is absolutely barred under some other principle of law." *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 17 Cal. 4th 553, 566 (1998). In *Zhang v. Superior Court*, for example, the Supreme Court of California barred relief under the UCL where the legislature "contemplated only administrative enforcement." 57 Cal. 4th 364, 384 (2013); *see also Neo4j, Inc. v. Graph Found., Inc.*, No. 19-CV-06226, 2020 WL 6700480, at *7 (N.D. Cal. Nov. 13, 2020) (plaintiff cannot use the UCL to plead a violation of the tax code). Here, too, the Supreme Court has "absolutely barred" private suits for aiding and abetting securities violations, and Congress has purposefully limited its enforcement to the SEC. Plaintiff's derivative liability claims must therefore be dismissed with prejudice.

***Second***, beyond Plaintiff's lack of standing, aiding and abetting liability requires an underlying violation of the securities laws, and conspiracy claims require showing an agreement to commit a crime. *See Todd*, 642 F.3d at 1225 (aiding and abetting: (1) a primary violation of the securities laws; (2) the aider's knowledge of the primary violation and of the aider's own role in furthering it; and (3) substantial assistance in the primary violation); *United States v. Kaplan*, 836 F.3d 1199, 1212 (9th Cir. 2016) (explaining that conspiracy requires: "(1) an agreement to engage in criminal activity, (2) one or more overt acts taken to implement the agreement, and (3)

the requisite intent to commit the substantive crime"). Here, there are none. *See supra* Section IV(B)(3)(a). Moreover, Plaintiff may not circumvent presidential official acts immunity by suing the platform that he uses to conduct and communicate his official acts. *See supra* Section IV(B)(2).

***Third***, scheme liability requires an underlying deceptive act and dissemination with "intent to defraud." *Lorenzo v. SEC*, 587 U.S. 71, 78 (2019). Plaintiff cannot show intent. The President's posts are public speech, and TMTG disclosed Truth API and its features to the public prior to its launch. Under binding Supreme Court precedent, "full disclosure forecloses liability under the misappropriation theory." *O'Hagan*, 521 U.S. at 655; *see also Stoneridge*, 552 U.S. at 158 ("[T]he conduct of [the] secondary actor" must satisfy "each of the elements or preconditions for [principal] liability"); *Cent. Bank*, 511 U.S. at 191 ("[A secondary actor] may be liable as a primary violator under 10b-5, assuming *all* of the requirements for primary liability under Rule 10b-5 are met."); *In re Enron Corp. Secs.*, 235 F. Supp. 2d 549, 591 (S.D. Tex. 2002) ("[A] complaint alleging that more than one defendant participated in a 'scheme' to defraud must allege a primary violation of § 10(b) by each defendant."). This Court should dismiss any derivative liability claims against TMTG with prejudice.

***(c) Plaintiff Fails to Plead a Primary Violation by TMTG.***

Plaintiff cannot state a primary violation claim against TMTG because it cannot allege the existence of a cognizable duty, or breach thereof, and, in any event, TMTG did not deceive anyone. To state a claim under the misappropriation theory, Plaintiff must allege "a specific relationship" predicated on a duty of trust and confidence between "the wrongdoer" and "the owner or rightful possessor of the information." *O'Hagan*, 521 U.S. at 661, 663; *accord SEC v. Clark*, 915 F.2d 439, 453 (9th Cir. 1990) ("The misappropriation theory . . . applies only where the misappropriation occurs by means of a violation of fiduciary or similar duty."). Moreover, "if the fiduciary discloses to the source that he plans to trade on the information, there is no . . . § 10(b) violation." *O'Hagan*, 521 U.S. at 655 ("[F]ull disclosure forecloses liability under the misappropriation theory.").

Plaintiff's (false) claim on this front must be dismissed for at least two reasons:

***First***, Plaintiff does not allege that TMTG itself misappropriated nonpublic information in violation of a duty to the government, nor could it. A duty of trust and confidence is imposed only when "the party in whom the confidence is reposed . . . voluntarily accepts or assumes to accept the confidence." *City Sols., Inc. v. Clear Channel Commc'ns, Inc.*, 201 F. Supp. 2d 1048, 1050 (N.D. Cal. 2002); *cf. In re Archegos 20A Litig.*, 156 F.4th 108, 119 (2d Cir. 2025) ("The *acceptance* of such a duty is crucial because a fiduciary duty cannot be imposed unilaterally by entrusting a person with confidential information." (quotation marks omitted)). Nowhere does Plaintiff plead facts showing that TMTG accepted any duty of confidentiality or that the U.S. Government ever entrusted TMTG with confidential information at all. Thus, TMTG cannot be held liable as a principal for insider trading under the misappropriation theory. *See In re Archegos*, 156 F.4th at 120 ("The [second amended complaint] fails to plausibly allege a key element of insider trading: the existence of a fiduciary-like duty.").

***Second***, even if Plaintiff had adequately pleaded that TMTG owed a duty of trust and confidence to the U.S. Government, Plaintiff does not plausibly allege that TMTG deceived the U.S. Government. To the contrary, Plaintiff concedes that TMTG "is *not trying to hide*" its operation of Truth API. Compl. ¶ 37 (emphasis added); *see also id.* ¶¶ 22 (TMTG announced Truth API would deliver posts faster), 30–31 (TMTG's pitch sheet explained features of Truth API, and interim CEO explained the alleged "50 millisecond advantage" on national television). Under binding Supreme Court precedent, "full disclosure forecloses liability under the misappropriation theory." *O'Hagan*, 521 U.S. at 655. Because Plaintiff cannot plead that TMTG deceived the U.S. Government, this Court must dismiss its misappropriation theory claim.

Thus, even taking every well-pleaded allegation as true (and they are not) Plaintiff alleges a publicly announced service that delivers the President's Truths to subscribers of Truth API fifty milliseconds faster than to users of Truth Social. Compl. ¶¶ 22, 31. It does not (and cannot) allege that TMTG or the President deceived anyone, traded on, or tipped material nonpublic information. *See Ernst & Ernst*, 425 U.S. at 193; *Zandford*, 535 U.S. at 819–20. And a speed advantage does not make public information confidential or yield privileged access to nonpublic information. *See Chiarella*, 445 U.S. at 233; *Dirks v. SEC*, 463 U.S. 646, 657–59 (1983).

Because Plaintiff fails to plead any violation of a federal securities law, whether primary or secondary, the securities laws predicate cannot support Plaintiff's unlawful UCL theory, and Plaintiff's second unlawful theory must be dismissed with prejudice.

**4. Plaintiff's Unfair Theory Fails Because It Is Based on the Same Conduct as the Unlawful Theory.**

Plaintiff's "unfair" theory falls with its two unlawful theories. *See* Compl. ¶ 58. Both rest on the same alleged violations of federal ethics and securities laws. "[W]here the same conduct alleged to be unfair under the UCL is also alleged to be a violation of another law, the UCL claim rises or falls with the other claims." *Hicks v. PGA Tour, Inc.*, 165 F. Supp. 3d 898, 911 (N.D. Cal. 2016), *aff'd in relevant part*, 897 F.3d 1109 (9th Cir. 2018).

The Complaint confirms as much. Every one of Plaintiff's flawed theories, unlawful and unfair alike, rests on the same alleged "information asymmetry" created by Truth API. *See* Compl. ¶¶ 58, 59–63. The challenged conduct is the same under both prongs: the supposed, but nonexistent, misappropriation of nonpublic information. Because that conduct does not support a claim under the unlawful prong, the unfair theory falls with it.

**C. Alternatively, the Court Should Transfer This Action.**

This case has nothing to do with San Francisco. Plaintiff improperly filed in San Francisco even though TMTG's witnesses and evidence are primarily in Florida, and none are in this District. If any part of the Complaint survives—and none should—this Court should transfer the action to the U.S. District Court for the Middle District of Florida. *See* 28 U.S.C. § 1404(a).

In deciding a motion to transfer under Section 1404, courts in this Circuit consider several factors, including: "(1) the location where the relevant agreements were negotiated and executed, (2) the state that is most familiar with the governing law, (3) the plaintiff's choice of forum, (4) the respective parties' contacts with the forum, (5) the contacts relating to the plaintiff's cause of action in the chosen forum, (6) the differences in the costs of litigation in the two forums, (7) the availability of compulsory process to compel attendance of unwilling non-party witnesses, and (8) the ease of access to sources of proof . . . . [and] [9] the relevant public policy of the forum state, if any." *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498–99 (9th Cir. 2000) (citation

modified). "No single factor is dispositive, and a district court has broad discretion to adjudicate motions for transfer on a case-by-case basis." *Park v. Dole Fresh Vegetables, Inc.*, 964 F. Supp. 2d 1088, 1093 (N.D. Cal. 2013).

The applicable *Jones* factors weigh heavily in favor of transfer. As explained above, Plaintiff's UCL claim hinges on federal law. Where an action involves federal law and contemplates transfer, the federal districts are both "familiar with the governing law." *Earth Island Inst. v. Quinn*, 56 F. Supp. 3d 1110, 1117 (N.D. Cal. 2014). Where a plaintiff predicates its UCL claim on federal law, "[p]laintiff's UCL claim—and thus, familiarity with governing law—is a very small factor in the overall [transfer] balance." *Cont'l Auto. Sys. v. Avanci, LLC*, No. 19-CV-02520, 2019 WL 6735604, at *18 (N.D. Cal. Dec. 11, 2019) (quotation marks omitted) (transferring case to Northern District of Texas).

In *Brady v. Von Drehle Corp.*, for example, this Court granted the defendant's motion to transfer where the defendant was (1) incorporated and headquartered in North Carolina; (2) "its main operations [were] there and it ha[d] no facilities in the Northern District of California"; (3) most of the witnesses lived "along the east coast"; and (4) "[a]ll relevant documents appear[ed] to be located in North Carolina," including financial records, and design, marketing, sales and distribution files. No. 14-CV-01732, 2014 WL 4243254, at *1 (N.D. Cal. Aug. 26, 2014). The same is true here. TMTG is incorporated and headquartered in Sarasota, Florida. TMTG's operation of Truth API, and Truth Social more generally, is based primarily in Florida. TMTG has no facilities in California, and Plaintiff alleges no concrete connection to California beyond the fact that Truth Social is accessible in the State, as it is in other States. Transfer to the Middle District of Florida will bring the case thousands of miles closer to the relevant witnesses and sources of proof.

Because the relevant factors in *Jones* weigh in favor of transfer, this Court should transfer the action to the U.S. District Court for the Middle District of Florida pursuant to 28 U.S.C. § 1404(a).

## V. CONCLUSION

For these reasons, TMTG respectfully requests that the Court dismiss Plaintiff's

Complaint with prejudice and stay all discovery while the motion is pending. To the extent that any aspect of the Complaint survives dismissal, and none should survive, TMTG requests that the Court transfer this action to the U.S. District Court for the Middle District of Florida.

Dated: November 25, 2026

**DLA PIPER LLP (US)**

By: */s/ Amanda L. Morgan*

AMANDA L. MORGAN
Attorneys for Defendant
TRUMP MEDIA &
TECHNOLOGY GROUP CORP.